CENTRAL BANK *v.* UNITED STATES.

No. 521.   Argued April 29, 1953.—Decided June 1, 1953.

*George H. Koster* argued the cause for petitioner. With him on the brief was *Llewellyn A. Luce.*

*Lester S. Jayson* argued the cause for the United States. With him on the brief were *Acting Solicitor General Stern, Assistant Attorney General Burger* and *Samuel D. Slade.*

Mr. Justice Reed delivered the opinion of the Court.

This grant of certiorari requires us to construe the provision of the Assignment .of Claims Act of 1940, 54 Stat. 1029, 31 U. S. C. § 203, which provides:

"Any contract entered into by the War Department or the Navy Department may provide that payments to an assignee of any claim arising under such contract shall not be subject to reduction or set-off, and if it is so provided in such contract, such payments shall not be subject to reduction or set-off for any indebtedness of the assignor to the United States arising independently of such contract." [1]

The facts of the case are not in dispute. The Graham Ship Repair Company, a California partnership, entered into a contract for ship repair work with the Navy Department on December 30, 1944. As permitted by the Assignment of Claims Act of 1940, the contract authorized the Graham Company to assign the proceeds of the contract to a bank and payments to the assignee bank were not to be "subject to reduction or set-off for any indebtedness of the Contractor to the Government arising independently of this contract."

After the contract had been made, the Graham Company arranged with petitioner, a California banking corporation, for the financing of the ship repair work. As security for the funds to be advanced, Graham assigned the proceeds payable under the contract to petitioner. This assignment was made on January 31, 1945. The Contracting Officer, Bureau of Ships, Navy Department, the Disbursing Officer and the General Accounting Office were duly notified of the assignment as required by the Act.

---

[1] Amended so as to include the Department of the Air Force by the Act of July 26, 1947, 61 Stat. 501, 508, 31 U. S. C. (Supp. III) § 203.

Pursuant to the assignment, the Graham Company received substantial sums of money from petitioner for use in performing the contract. During the course of performance Graham failed to remit to the Collector of Internal Revenue $453,469.55 in withholding taxes, and $11,462.91 in federal unemployment taxes, which it had withheld, pursuant to §§ 1401 and 1622 of the Internal Revenue Code, from the salaries and wages of its employees who were engaged in work called for by the Navy contract. Instead of remitting these sums to the Collector, Graham had converted them to its own use. Because of this dereliction the contract was terminated by the Navy on March 31, 1946, and the individuals of the Graham partnership pleaded guilty to an indictment for willful attempt to evade the payment of the withheld taxes.

At the time the contract was terminated, Graham's obligation to the Government for the unpaid withholding taxes, with interest and penalties, aggregated $616,750.95. At that time the sum of $110,966.08 was due Graham from the Government for work performed under the contract. Also at that time Graham was indebted to petitioner in an amount in excess of $110,966.08 for advances made by petitioner pursuant to the assignment.

Petitioner, as assignee, filed a claim for the balance due from the Government under the contract. The Commissioner of Internal Revenue also claimed that amount. The Comptroller General ruled that the $110,966.08 was a proper set-off against Graham's tax indebtedness and accordingly reduced such indebtedness to $415,018.17.

Thereafter petitioner brought this suit in the Court of Claims. That court held that the set-off made by the Comptroller General was proper because the tax deductions withheld were "not entirely independent of such contract," *Central Bank* v. *United States,* 123 Ct. Cl. 237,

105 F. Supp. 992, 994, and that petitioner was therefore not entitled to recover under the assignment.

Prior to 1940, an assignment such as Graham made to petitioner would have been of no effect as against the United States. Under the Anti-Assignment Statutes (R. S. §§ 3477 and 3737), while the assignment might in some circumstances have been good as between the assignor and assignee (*Martin* v. *National Surety Co.*, 300 U. S. 588), it could not operate to the detriment of rights of the United States. Any set-off which the United States had against an assignor would have been effective against the assignee.

The Assignment of Claims Act of 1940, amending the Anti-Assignment Statutes,[2] validated the assignment of moneys due or to become due under any government contract if the assignment were made to a financing in-

---

[2] The issue before us has been prospectively settled for others by the 1951 Assignment of Claims Act (65 Stat. 41, 31 U. S. C. (Supp. V) § 203). That Act amended the Assignment of Claims Act of 1940 by rephrasing subsection 4 so as to bar by specific words the United States from setting off "any liability of the assignor on account of (1) renegotiation . . . (2) fines, (3) penalties . . ., or (4) taxes, social security contributions, or the withholding or non-withholding of taxes or social security contributions, whether arising from or independently of such contract.

"Except as herein otherwise provided, nothing in this Act, as amended, shall be deemed to affect or impair rights or obligations heretofore accrued." 65 Stat. 41, 42.

This amendment was caused by uneasiness among lenders because of rulings of the Comptroller General:

"In an opinion dated May 17, 1949, the Comptroller General held that, in the event of a price revision under a Government contract, any amount in excess of the contract price as so revised may either be withheld from payment to the assignee 'or recovered directly from the assignee if already paid.' Generally, when any payment is received by an assignee bank, it is immediately applied to the contractor's loan, and the excess is released to the borrower. In several instances, long after full payment of a bank's loan to a contractor,

stitution. The Act authorized the War and Navy Departments to limit the Government's previous rights of set-off. See R. S. §§ 3477, 3737, as amended. It provided, see 31 U. S. C. § 203, p. 640, *supra,* "that payments to an assignee of any claim arising under such contract shall not be subject to reduction or set-off."

The Assignment of Claims Act of 1940 was evidently designed to assist in the national defense program through facilitating the financing of defense contracts by limiting the Government's power to reduce properly assigned payments.[3] Borrowers were not to be penalized in security because one contracting party was the Government. Contractors might well have obligations to the United States not imposed by the contract from which the payments flowed, as for example the contractor's income tax for prior earnings under the contract. The taxes here involved are another good illustration of the dangers to lenders.

The clause in question which prohibits set-offs for "any indebtedness of the assignor to the United States arising independently of such contract," was embodied in an

the Comptroller General has made claims for recovery of payments previously made to the bank assignee.

"It had also been the understanding of banks that the statute protected them against set-off by the Government on account of any claims by the Government against the contractor arising outside of the terms of the assigned contract. However, in an opinion dated May 15, 1950, the Comptroller General ruled that claims by the Government against a contractor on account of unpaid social-security contributions and withheld income taxes were claims which did not arise independently of the assigned contract." S. Rep. No. 217, 82d Cong., 1st Sess., p. 2.

[3] Hearings before the Senate Committee on Banking and Currency on S. 4340, 76th Cong., 3d Sess., p. 2 *et seq.;* 86 Cong. Rec. 12803; H. R. Rep. No. 2925, 76th Cong., 3d Sess., p. 2; S. Rep. No. 2136, 76th Cong., 3d Sess., p. 2.

amendment introduced by Senator Barkley during debate on the Act.[4]  In proposing the amendment, the Senator stated:

> "Mr. President, the amendment merely provides that when a contractor, in order to obtain money so that he may perform his contract with the Government under the defense program, assigns his contract to a bank or trust company in order to get money with which to proceed with the work, it shall not be permissible to offset against the claim or contract later an indebtedness which the contractor may owe the Government on account of some other contract or some other situation. . . ."

Otherwise,

> ". . . the Government could come in and assert a claim against the contractor on account of something else which had no relationship whatever to the contract and the defense program."

In the decision below the court said:

> "The assignee knew that the contractor would be required to withhold and pay taxes to the defendant. The obligation of the contractor for the taxes in question arose before the partners converted such taxes to their own use and such obligation was therefore directly associated with the contract.

> "In order to be independent, as we think that term was used and intended by the Assignment of Claims Act, the indebtedness must arise irrespective of, exclusive of, and separate from the contract, and must have no direct relation with such contract." [5]

---

[4] 86 Cong. Rec. 12803.

[5] *Central Bank* v. *United States*, 123 Ct. Cl. 237, 244, 245, 105 F. Supp. 992, 994.

To support its position, the words of *United States* v. *Munsey Trust Co.* were relied upon:

"[One] is not compelled to lessen his own chance of recovering what is due him by setting up a fund undiminished by his claim, so that others may share it with him." 332 U. S. 234, 240.

The *Munsey* case is inapplicable. It turns on the ability of the Government to reimburse itself ahead of a surety for sums expended to pay laborers out of funds withheld by the United States from the surety's principal. No problem of assignment was involved and we held the Government could set off its independent claim against the surety.

The requirement that Graham withhold taxes from the "payment of wages" to its employees and pay the same over to the United States did not arise from the contract. The requirement is squarely imposed by §§ 1401 and 1622 of the Internal Revenue Code.[6] Without a government

---

[6] "§ 1400. Rate of tax.

"In addition to other taxes, there shall be levied, collected, and paid upon the income of every individual a tax equal to the following percentages of the wages . . . .

"§ 1401. Deduction of tax from wages—(a) Requirement.

"The tax imposed by section 1400 shall be collected by the employer of the taxpayer, by deducting the amount of the tax from the wages as and when paid.

"(b) Indemnification of employer.

"Every employer required so to deduct the tax shall be liable for the payment of such tax, and shall be indemnified against the claims and demands of any person for the amount of any such payment made by such employer.

. . . . .

"§ 1622. Income tax collected at source—(a) Requirement of withholding.

"Every employer making payment of wages shall deduct and withhold upon such wages a tax equal to the sum of the following: . . . ."

contract Graham would owe the statutory duty to pay over the taxes due, just as it would to pay its income tax on profits earned. Graham's embezzlement lay neither in execution nor in breach of the contract. It arose from the conversion of the withheld taxes which Graham held as trustee for the United States pursuant to § 3661 of the Code.[7]    Assignor Graham's indebtedness to the United States arose, we think, "independently" of the contract.

Finally it is urged that the Act should be construed so as to protect the United States.    The short answer to this is that the Act should be construed so as to carry out the purpose of Congress to encourage the private financing of government contracts.[8]    To grant the Gov-

[7] "§ 3661. Enforcement of liability for taxes collected.

"Whenever any person is required to collect or withhold any internal-revenue tax from any other person and to pay such tax over to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States.    The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable with respect to the taxes from which such fund arose."

[8] *United States* v. *Guaranty Trust Co.*, 280 U. S. 478, 483.    In the *Guaranty Trust* case the United States sought priority under R. S. § 3466 for its debts from embarrassed railroads.    Transportation Act of 1920, Tit. II, §§ 207, 209, 210, 41 Stat. 456, 457–469.    Although there was no specific waiver of § 3466, similar to the waiver of the right of set-off or reduction here claimed, this Court held:

"To have given priority to debts due the United States pursuant to Title II, would have defeated the purpose of Congress.    It not only would have prevented the reëstablishment of railroad credit among bankers and investors, but it would even have seriously impaired the market value of outstanding railroad securities.    It would have deprived the carriers of the credit commonly enjoyed from supplymen and others; would have seriously embarrassed the carriers in their daily operations; and would have made necessary a great enlargement of their working capital.    The provision for loans under § 210 would have been frustrated.    For, carriers could ill

ernment its sought-for rights of set-off under the circumstances of this case, would be to defeat the purpose of Congress. It would require the assignee to police the assignor's accounting and payment system. It would increase the risk to the assignee, the difficulty of the assignor in financing the performance, and the ultimate cost to the Government.

*Reversed.*

THE CHIEF JUSTICE, MR. JUSTICE BURTON and MR. JUSTICE CLARK dissent.

MR. JUSTICE BLACK and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

afford voluntarily to contract new debts thereunder which would displace, *pro tanto*, their existing bonded indebtedness. The entire spirit of the Act makes clear the purpose that the rule leading to such consequences should not be applied." 280 U. S., at 485.