PETERMAN LUMBER COMPANY, Inc., Plaintiff,

v.

Herman ADAMS, doing business as Adams Manufacturing Company, and The First National Bank of Fort Smith, Arkansas, Defendants.

Civ. A. No. 1162.

United States District Court, W. D. Arkansas, Ft. Smith Division.

Feb. 7, 1955.

Pryor, Pryor & Dobbs, Charles A. Beasley, Ft. Smith, Ark., for plaintiff.

Daily & Woods, Ft. Smith, Ark., for defendants.

JOHN E. MILLER, District Judge.

On October 23, 1954, the plaintiff filed its complaint against defendants seeking to recover from the defendant Adams the sum of $7,961.76 and from the defendant Bank the sum of $4,449.22.

Service of summons was had on defendant Bank on October 23, 1954, and on the defendant Adams on October 25, 1954.

On November 10, 1954, the defendant Bank filed its separate answer in which it denied that it was indebted to plaintiff in the sum of $4,449.22 or any other sum.

The case was set for a pre-trial conference on December 7, 1954, and at that time the defendant Adams was in default. However, he was present in the court room and, when the case was reached on the call of the calendar, he stated in open court that he had no defense to

the claim of plaintiff and, accordingly, a judgment was rendered in favor of plaintiff against the defendant Adams in the sum of $7,961.76, with interest thereon from the date of the judgment.

Prior to the entry of the default judgment against the defendant Adams, the plaintiff had filed its first amendment to the complaint and, subsequent to the entry of the default judgment against Adams, the defendant Bank filed its first amendment to its separate answer.

On January 17, 1955, the cause between the plaintiff and defendant Bank was tried to the court and, upon the completion of the introduction of the testimony by both parties, the cause was submitted and taken under consideration. The attorneys for the parties were allowed time in which to file written briefs in support of their respective contentions. The briefs have been received and considered along with the pleadings, the ore tenus testimony, the stipulations and exhibits and the court now makes and files herein its findings of fact and conclusions of law, separately stated.

## Findings of Fact

### No. 1.

The plaintiff is a corporation incorporated under the laws of the State of Alabama.

The defendant, Herman Adams, is a citizen of Arkansas and resides within the Fort Smith Division of the Western District. At all times material herein, he was trading or engaged in business under the trade name of Adams Manufacturing Company.

The defendant, The First National Bank of Fort Smith, Arkansas, is a corporation organized and existing under and by virtue of the laws of the United States and maintains its sole place of business in the City of Fort Smith, Arkansas.

The controversy involved herein exceeds the sum of $3,000, exclusive of interest and costs.

### No. 2.

The defendant, Herman Adams, will be hereinafter referred to as Adams and the defendant, The First National Bank, will be hereinafter referred to as the Bank.

On June 11, 1954, Adams was awarded Contract No. DA 11–009–QM–24050 for 920,350 pins, tent, wood, 16 inch, Type 1, open tank treated, by the Contracting Officer, Chicago Quartermaster Depot, United States Army, Quartermaster Purchasing Division, and was to be paid for the pins furnished under the contract at prices set forth in the contract.

### No. 3.

At the time Adams was awarded the above named contract, he was engaged in the business of manufacturing various articles of wood required by the United States Army, and was performing several other Government contracts. His place of business was at Charleston, Arkansas. Apparently his finances were limited but his business expanded rapidly. It was necessary for him to obtain finances with which to operate and expand his business to perform his contractual obligations. At the time the contract herein involved was awarded him he had procured and was procuring money from the Bank. The testimony does not show when the Bank first began lending him money, but on May 21, 1954, Adams was indebted to the Bank in the sum of $30,000 and at that time executed, acknowledged and delivered two mortgages to the Bank, one on the real estate and one on the equipment being used by him in the operation of his business. Both mortgages secured the payment of the then indebtedness to the Bank and future indebtedness that might become due and owing from Adams to the Bank. On July 2, 1954, Adams assigned the contract herein involved to the Bank. The assignment was made: "In accordance with the provisions of the Act, Public No. 811, 76th Congress, 3d Session, approved October 9, 1940, known as the Assignment of Claim Act of 1940, I (we) this day, for

value received, do hereby assign to the First National Bank of Fort Smith, Arkansas, all right, title and interest, to all moneys now due, or to become due from the United States or from any agency or department thereof, under the above cited contract.

"I (we) further stipulate and agree that no additional assignments will be made under this contract; that payments thereunder will be made by checks drawn to the order of the assignee."

The assignment was executed on the standard and uniform form provided by the contracting agency of the United States. Notice of said assignment was acknowledged in writing by the contracting agency as having been received at 8 a.m. on July 16, 1954.

### No. 4.

On July 6, 1954, Adams entered into a subcontract with the plaintiff, Peterman Lumber Company. Apparently Adams and the plaintiff were negotiating concerning a subcontract at the time Adams assigned his contract to the Bank, but the testimony is undisputed that the Bank did not know of such negotiations. The subcontract was prepared by the attorney for Adams at Charleston, Arkansas, and forwarded to the plaintiff at its place of business at Peterman, Alabama. The plaintiff signed the subcontract in Alabama and returned it to Adams where he completed the execution of the subcontract in Charleston, Arkansas.

By the terms of the subcontract, the plaintiff agreed to manufacture and ship Item 1h, being 147,200 tent pins, from Peterman, Alabama, to Bellbluff, Virginia, and Item 1L, being 165,450 tent pins, from Peterman, Alabama, to New Cumberland, Pennsylvania. The Contracting Officer, on August 11, 1954, consented to the change in the place of origin of these items and reduced the unit price because of the change in the place of origin of the shipment, which change in the unit price was duly agreed to by Adams and the plaintiff.

### No. 5.

Adams lived at Charleston, Arkansas, and carried his checking account with the American State Bank of Charleston, which bank was a correspondent of the defendant bank. In fact, the President of the defendant bank is a director of the American State Bank.

It was the practice of Adams and the defendant Bank, in cooperation with the American State Bank, that when a shipment was ready to be made by Adams he would execute a demand note payable to the defendant Bank, usually in the amount of the invoice representing said shipment, and would deposit said note in the American State Bank, receiving credit therefor in his checking account. The demand note and a copy of the invoice would be sent to the defendant Bank, and said Bank would credit the American State Bank with the amount it had credited Adams on said note.

### No. 6.

On September 1, 1954, the plaintiff, under its subcontract, shipped from Peterman, Alabama, to Richmond Quartermaster Depot, Bellbluff, Virginia, 43,-800 units of the number that was to be manufactured by it under its subcontract and forwarded the Invoice No. 3499 to Adams. The invoice was for $3,876.08. The original invoice was forwarded by Adams to the Contracting Officer of the United States Army and a duplicate was furnished the Bank. On the date that Adams received the invoice, he called the Bank on long distance telephone and advised it that he had received the invoice and that he would forward it to the Bank, but that he would like for the Bank to cause his account in the American State Bank of Charleston, Arkansas, to be credited for the amount of the invoice. The Bank agreed to do so and when the duplicate copy of the invoice was furnished the Bank by Mr. Adams it bore the following notation: "We have not drawn on this invoice, and will pay Peterman Lumber Company when money is received, less our commission."

Adams also certified on the face of the invoice that the moneys due under the contract had been assigned to The First National Bank of Fort Smith, Arkansas. When the Bank received payment of the amount of the duplicate invoice from Adams, it caused the American State Bank of Charleston, Arkansas, to credit Adams' checking account therein with the amount of the invoice.

### No. 7.

On September 7, 1954, the plaintiff shipped to New Cumberland General Depot, United States Army, New Cumberland, Pennsylvania, 55,050 units of Item 1L under its subcontract and sent the invoice to Adams. Adams forwarded the original to the Contracting Purchaser and gave the Bank a duplicate. The amount that was due Peterman on that invoice was $4,449.22, for which the plaintiff is asking judgment against the defendant Bank. This invoice was paid in due time and the proceeds thereof were credited by the Bank on the indebtedness owed it by Adams evidenced by notes dated June 18 and 19, 1954, which were the oldest notes of Adams that were held by the Bank.

The plaintiff is not seeking to hold the defendant Bank liable for the amount of the invoice dated September 1, 1954, since the proceeds of that invoice were delivered to Adams in accordance with the request of Adams as set forth in Finding Number 6.

### No. 8.

The subcontract heretofore referred to in Finding of Fact No. 4, inter alia, provided that the subcontractor (plaintiff) agreed to abide by the terms of the master contract held by Adams; that the subcontractor (plaintiff) would make the shipments covered by the contract and forthwith send an invoice to the contractor (Adams); that Adams would in turn immediately issue his invoice to the Chicago Quartermaster Depot, United States Army, and that he would, upon payment to him by said Quartermaster Depot, pay the subcontractor the net price on the subcontractor's invoice.

The subcontract further provided: "The subcontractor specifically agrees that under no circumstances shall he look to anyone other than the contractor for the payment of his invoices."

The subcontract also provided that it would not become operative and effective until approved by the Chicago Quartermaster Depot. As heretofore stated, the subcontract was approved by the Quartermaster Depot on August 11, 1954.

Adams is indebted to the plaintiff under the subcontract in the sum of $7,961.76, for which amount judgment, as heretofore stated, was rendered against Adams in favor of plaintiff. The plaintiff is seeking to hold the defendant Bank liable for the amount due it under the invoice of September 7, 1954, in the sum of $4,449.22, which sum the Bank was paid by the Contracting Officer under and by virtue of the assignment of June 11, 1954, held by the Bank and heretofore referred to in Finding of Fact No. 3.

The President of the defendant Bank did not know that any part of the contract held by Adams had been subcontracted until sometime in September, 1954, when he was so advised by the attorney for Adams.

### No. 9.

On September 29, 1954, the defendant Bank filed an action to foreclose the real estate and chattel mortgages heretofore referred to. A receiver was appointed for the mortgaged property and a decree was rendered in favor of the Bank against Adams for approximately $140,000. In computing the amount of the judgment rendered by the Chancery Court of Franklin County, Arkansas, where the foreclosure suit was filed, the indebtedness owed by Adams to the Bank was credited with the sum now in issue between plaintiff and the defendant Bank. The mortgaged assets were sold at public auction and the Bank became the purchaser for the sum of $100,000, leaving an excess judgment in its favor against Adams of approximately $40,000, which remains unpaid. The sale to the

Bank has been confirmed by the Chancery Court and the deed has been delivered to the Bank and is now of record. The Bank's security has been exhausted and Adams is wholly insolvent.

### No. 10.

All of the demand notes executed by Adams with respect to the particular contract in question were duly paid with money received by the Bank from the Army pursuant to the assignment of said funds by Adams to the Bank.

The money received by the Bank in payment for plaintiff's shipment of September 7 was used by the Bank to satisfy the oldest notes of Adams that it held. Two of said notes were dated June 18, 1954, and three of them were dated June 19, 1954. These notes had been executed by Adams in connection with a subcontract Adams had with Remington-Rand for the production of shell boxes for the Army. Adams had also assigned to the Bank his payments under the Remington-Rand subcontract.

### No. 11.

Negotiations leading up to the subcontract were conducted by Adams and his attorney, Mr. Bumpers, with Mr. Lee, who was either an agent of plaintiff, or a broker. Adams had no desire to subcontract any of the work, but after some discussion he consented to do so. Both Adams and Bumpers informed Lee that Adams either had or would assign his payments under the contract to the Bank, and thus plaintiff had notice of said assignment.

### Discussion

Plaintiff contends that the assignment from Adams to the Bank was a security instrument securing the advancement of money by the Bank to Adams for the performance of this particular contract with the Army; that all the money advanced by the Bank in connection with said contract had been repaid to the Bank; and that plaintiff has an equitable claim to $4,449.22 of the final payment by the Army to the Bank which is superior to the Bank's legal title under the assignment.

Defendant Bank contends that the assignment was general and valid for all purposes; that plaintiff was nothing more than a general creditor of Adams; and that the Bank's legal title to the payments is superior to any claim of plaintiff.

Both parties contend that the substantive rights of the parties are governed by the Assignment of Claims Act of 1940, as amended.

At the outset it may be noted that the Bank and Adams fully complied with the Assignment of Claims Act and there is no question as to the validity of the assignment. 41 U.S.C.A. § 15, 31 U.S.C. A. § 203.

41 U.S.C.A. § 15, provides, inter alia:

"No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. * * *

"The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financing institution, including any Federal lending agency: * * *.

"Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this section, shall constitute a valid assignment for all purposes.

"In any case in which moneys due or to become due under any contract are or have been assigned pursuant to this section, no liability of any nature of the assignor to the United States or any department or agency thereof, whether arising from or in-

dependently of such contract, shall create or impose any liability on the part of the assignee to make restitution, refund, or repayment to the United States of any amount heretofore since July 1, 1950, or hereafter received under the assignment. * * *"

Paragraphs two and three of the statute were added by the 1940 amendment to the Act, and paragraph four was added by the 1951 amendment to the Act. Prior to the 1940 amendment it was settled that the purpose of the Act was to protect the Government from "becoming embroiled in conflicting claims," and the Act did not control the rights of third parties once the money had been paid by the Government to the contractor or subsequent payee. Martin v. National Surety Co., 300 U.S. 588, 57 S.Ct. 531, 534, 81 L.Ed. 822; 12 A.L.R.2d 460, 468, et seq.

In 1940 the Act was amended to permit assignments by Government contractors to banks and other financing institutions. In addition to paragraphs two and three above quoted, the 1940 amendment added the following paragraph:

"Any contract entered into by the War Department or the Navy Department may provide that payments to an assignee of any claim arising under such contract shall not be subject to reduction or set-off, and if it is so provided in such contract, such payments shall not be subject to reduction or set-off for any indebtedness of the assignor to the United States arising independently of such contract." 54 Stat. 1029.

The purpose of the amendment was "to assist in the national defense program through facilitating the financing of defense contracts by limiting the Government's power to reduce properly assigned payments." Central Bank v. United States, 345 U.S. 639, 643, 73 S.Ct. 917, 919, 97 L.Ed. 1312; United States v. Hadden, 6 Cir., 192 F.2d 327. The Act was again amended in 1951, said amend-

ment being designed to clarify the question of set-off by the Government against an assignee. 31 U.S.C.A. § 203, 41 U. S.C.A. § 15.

Since the 1940 amendment to the Act, it has been stated that "The provisions of the statute governing assignments of claims against the Government are for the protection of the Government and not for the regulation of the equities of the claimants as between themselves." McKenzie, Trustee in Bankruptcy v. Irving Trust Co., 323 U.S. 365, 369, 65 S.Ct. 405, 407, 89 L.Ed. 305. See also, National Refining Co. v. United States, 8 Cir., 160 F.2d 951, 954.

In cases involving assignments to banks, different views have been taken as to the effect of the 1940 amendment upon the rights of the assignee bank. The Court of Appeals for the Fifth Circuit has held that the effect of the amendment was to give full protection to any bank or lending institution complying with the Act, unless the money advanced by the bank or lending institution was diverted to some use outside the contract. Coconut Grove Exchange Bank v. New Amsterdam Casualty Co., 5 Cir., 149 F.2d 73; General Casualty Co. of America v. Second Nat. Bank of Houston, 5 Cir., 178 F.2d 679. On the other hand, the United States Court of Claims has held that the amendment to the Act did not change the relative rights of the assignee bank and third parties, and that the assignee under the Act acquires no greater right to the amount due under the contract than the assignor had. Royal Indemnity Co. v. United States, 117 Ct.Cl. 736, 93 F.Supp. 891; Hardin County Sav. Bank v. United States, 106 Ct.Cl. 577, 65 F.Supp. 1017.

The above cited cases, however, did not have under consideration the question presented to the Court in the instant case. Here, the assignment by Adams to the Bank was made prior to the time plaintiff entered into the subcontract with Adams, and thus the rights accruing to the Bank by reason of the assignment are clearly superior to plain-

tiff's rights under the subcontract. The question is, what rights did the Bank have by reason of the assignment?

■ The Court agrees with plaintiff's contention that as a general rule "An assignment that is made as collateral security for a debt gives the assignee only a qualified interest in the assigned chose, commensurate with the debt or liability secured, although the assignment is absolute on its face." 6 C.J.S., Assignments, § 93, p. 1150. See also, First Nat. Bank of Stockton v. Pomona Tile Mfg. Co., 82 Cal.App.2d 592, 186 P. 2d 693. Thus the vital issue in this case is whether the assignment was to secure all the debts incurred by Adams to the Bank in the financing of the Government contracts, or was solely to secure the advances made by the Bank to Adams on the particular contract herein involved.

If the assignment was merely to secure the money advanced by the Bank to Adams in connection with this particular contract (No. DA 11–009–QM–240–50), then the Bank's right would not extend to money claimed by plaintiff herein, since all funds advanced by the Bank on this contract were repaid to the Bank and the money claimed by plaintiff was used by the Bank to pay an indebtedness incurred by Adams to it on a previous contract or contracts, the proceeds of which had also been assigned to the Bank.

But, if the assignment was made to secure the money advanced by the Bank to Adams in connection with his whole operation of performing Government contracts, then the Bank's right would extend to the money claimed by plaintiff, since said money was used to pay an indebtedness owed by Adams to the Bank in connection with such contract or contracts.

■ The Court is of the opinion that the Assignment of Claims Act does not limit the effect of the assignment between assignee Bank and other private parties, other than to impliedly limit such assignments to those made for the purpose of financing Government contracts in general. In other words, the purpose of the Act, as amended, is to assist Government contractors in financing their operations, and the Court is convinced that under the Act a contractor may assign his payments under a particular contract to the bank as security for the advances made in connection with said contract; or the contractor (when he is performing a number of Government contracts) may assign his payments under a particular contract as security for money advanced by the bank in connection with his whole operation of performing other Government contracts as well as that particular contract.

■■ In the instant case Adams had been and was performing a number of Government contracts. The defendant Bank advanced him money to purchase machinery, equipment, etc., with which to perform these contracts. The assignment from Adams to the Bank appears on its face to be an absolute assignment of all money payable to Adams under the contract, and in view of all the evidence in the case the Court is convinced that Adams and the Bank intended to, and did, effect a valid assignment of said money as security for all the advances made by the Bank to Adams to finance his complete operation in performing the various Government contracts. That being true, the Bank's rights under the assignment extended to all the payments made under the contract, and the Bank had the right to apply the money in question to the payment of Adams' indebtedness on prior Government contracts. Therefore, the Bank's application of said money in payment of Adams' indebtedness on the Remington-Rand contract was proper.

It is true that plaintiff furnished all the labor and materials which produced the money in question, and it seems a harsh result that it must bear the loss. But, plaintiff solicited the subcontract with notice that Adams had or would assign his payments to the Bank, and the assignment to the Bank was made prior

to the execution of the subcontract. It follows that plaintiff's claim must be subordinated to that of the Bank.

■ In passing it may be noted that during the trial of this case the Court raised the question of whether the substantive rights of the parties were governed by the State law or by the Federal Statute. In their briefs both parties contend that the Statute governs, and the Court is now of the opinion that the Statute is controlling in the instant case. However, the result would be the same if the State law governed, since the assignment was made in Arkansas and the Arkansas law provides that the rights of an assignee (of money due or to become due on a contract) are superior to the rights of bona fide purchasers, creditors, or other assignees or transferees of the assignor. Sec. 68–805, Ark.Stats. 1947, Annotated.

### Conclusions of Law

#### No. 1.

The Court has jurisdiction of the parties to and the subject matter of this action.

#### No. 2.

The assignment by Adams to the Bank was valid, and was made to secure the indebtedness from Adams to the Bank in connection with the financing of Adams' complete operation of performing Government contracts.

The Bank's legal title to the payments under the contract is superior to the equitable claim of plaintiff, and the Bank had the legal right to apply said payments to indebtedness incurred by Adams to it on other Government contracts.

#### No. 3.

Plaintiff's complaint should be dismissed for want of equity.

A judgment in accordance with the above should be entered.