**MERCANTILE NATIONAL BANK AT DALLAS**

v.

**UNITED STATES.**

No. 488-56.

United States Court of Claims.

July 15, 1960.

Hubert Dee Johnson, Dallas, Tex., for plaintiff.

Gerson B. Kramer, Silver Springs, Md., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

MADDEN, Judge.

The plaintiff, a national banking association with a place of business in Dallas, Texas, brings this action as an assignee of moneys allegedly due under a supply contract between Minera Fernandez, S.A., of Parral, Chihuahua, Mexico, and the United States. The plaintiff seeks in the action to recover moneys withheld and applied by the United States to recoup the amounts of alleged overpayments theretofore made by the United States under the contract.

The contract involved in the litigation was entered into as of October 20, 1951. The contracting officer who signed the contract on behalf of the United States was an official of the Emergency Procurement Service, General Services Administration. Under the contract, Minera Fernandez, S.A., (which will usually be referred to hereafter in the opinion as "the contractor") agreed to supply, and the United States agreed to buy, 100,000 long dry tons of manganese ore.

The ore was to be mined in and exported from Mexico. Specified quantities were to be delivered to the United States during the period April 1–June 30, 1952, and during each of the subsequent fiscal years 1953, 1954, 1955, and 1956.

The contract provided that the United States was to pay for the ore at the rate of 93 cents per unit of contained manganese. However, the Special Terms, Conditions, and Specifications of the contract contained a paragraph (4–b) which stated in part as follows:

"The unit prices shown in this Contract are based on the present official rate of exchange between the United States Dollar and the Mexican Peso of 8.65 Pesos to One Dollar * * *. Any increase or decrease in such rate of exchange * * * shall be for the account of the Government."

On May 5, 1953, the contractor, which had not yet begun deliveries under the contract and, hence, was in default, requested that the delivery schedule set out in the contract be revised so as to fix July 1, 1953, as the date for the beginning of deliveries. The General Services Administration agreed to the contractor's proposal and, accordingly, the contract was amended on May 6, 1953, by changing the delivery schedule in the manner requested by the contractor. At the same time, in consideration of the Government's action in agreeing to the modification of the delivery schedule, there was inserted in the Special Terms, Conditions, and Specifications of the contract a new pharagraph (4–e) stating in part as follows:

"Notwithstanding any other provisions of the contract the unit price * * * which shall apply to the first 9,000 long dry tons delivered during the period July 1, 1953 to June 30, 1954; the first 9,000 long dry tons delivered during the period July 1, 1954 to June 30, 1955; and the first 6,000 long dry tons delivered during the period July 1, 1955 to June 30, 1956 shall not exceed

$0.93 per long ton unit of contained manganese * * *."

Subsequently, in consideration of the Government's action in agreeing to a further modification of the delivery schedule, paragraph 4–e was revised on July 16, 1954, to read as follows:

"Notwithstanding any other provisions of the contract, including, without limitation, any increase in the 'rate of exchange * * *' provided for in paragraph b of this Article 4, the unit price * * * which shall apply to all manganese ore delivered after July 1, 1954 shall not exceed $0.93 per long ton unit of contained manganese * * *."

At the time the contract was entered into on October 20, 1951, the official rate of exchange between the Mexican peso and the United States dollar was 8.65 pesos to 1 dollar (i. e., the Mexican peso was worth $0.115606). As of April 19, 1954, the Mexican peso had been devalued to the point where the official rate of exchange was 12.51 pesos to 1 dollar (i. e., the Mexican peso was worth $0.079936). However, the contractor, both with respect to ore shipments made prior to April 19, 1954, and those made after that date, submitted to the General Services Administration invoices on the basis of a unit price of 93 cents. The GSA paid such invoices on this basis up to and including invoice No. 284, which covered a shipment of ore delivered on April 17, 1955.

During the period April 23–May 26, 1955, the contractor furnished to the General Services Administration 2,429.-247 tons of ore under the contract, and submitted invoices totaling $95,322.73 on the basis of the unit price of 93 cents used by the contractor, unadjusted for any devaluation of the Mexican peso. No payment was made by the GSA for these shipments, except in the form of credits against alleged overpayments theretofore made on prior invoices. The contractor's right to proceed with further deliveries was subsequently terminated by the contracting officer because of the contractor's failure as of June 30, 1955, to deliver by that date the minimum quantity of ore required by the contract.

The reason for the discontinuance of payments by the General Services Administration under the contract was the discovery, on or about May 13, 1955, by personnel of the agency engaged in the administration of the contract that the Mexican peso had been devalued. The GSA took the position that it had been overcharged on the ore delivered between the date of the devaluation of the Mexican peso and April 17, 1955, and that such overpayments (estimated at more than $150,000) should be set off against amounts otherwise due for ore delivered during the period April 23–May 26, 1955.

■ A preliminary question in the case is whether the proper unit price in United States money for the ore delivered under the contract after the devaluation of the Mexican peso was 93 cents, as set out in the contractor's invoices, or a proportionately lower figure computed in accordance with paragraph 4–b of the Special Terms, Conditions, and Specifications to reflect the decrease in the value of the peso.

The plaintiff, as an assignee of the contractor, contends that paragraph 4–b of the Special Terms, Conditions, and Specifications, when considered in connection with paragraph 4–e, was so ambiguous as to be ineffective; and that the actions of the parties between April 19, 1954, and April 17, 1955, in billing and paying for ore deliveries on the basis of 93 cents per unit of contained manganese, notwithstanding the devaluation of the Mexican peso, constituted a practical construction by the parties of the contract provisions on price as meaning that the unit price of 93 cents originally fixed in the contract should not be affected by changes in the relationship between the Mexican peso and the United States dollar during the life of the contract.

As previously indicated, paragraph 4–b of the Special Terms, Conditions,

and Specifications stated that the unit price of 93 cents was based on the then current exchange rate of 8.65 Mexican pesos to 1 United States dollar, and then provided that "Any increase or decrease in such rate of exchange * * * shall be for the account of the Government." In the context, however, the provision could have only one reasonable meaning. The phrase, "Any increase or decrease in such rate of exchange," could only have referred to any future expansion or contraction of the ratio representing the relationship between the value of the Mexican peso and the value of the United States dollar. The phrase, "shall be for the account of the Government," undoubtedly meant that the United States should benefit from any expansion, and bear the disadvantage of any contraction, of the exchange ratio that might occur during the life of the contract, the unit price in United States money being adjusted downward or upward proportionately to reflect any fluctuation in the exchange rate.

The view expressed in the preceding paragraph is confirmed by the fact that paragraph 4–b of the Special Terms, Conditions, and Specifications was included in the contract pursuant to a request from the contractor that the contract contain such an escalator clause. The contractor's representation in this respect was stated as follows:

"All our production and shipping costs are based on the present value of the Mexican Peso (8.65 Pesos to $1.00 U.S. Cy.). Therefore, any contract awarded by the United States Government to our company must contain the provision that in the event that the Mexican Peso is revalued upward or downward the contract price for the ore will be adjusted accordingly."

The contractor assigned to the plaintiff on October 8, 1954, all moneys due or to become due under the contract (except for $6.90 per ton previously assigned to the Export-Import Bank of Washington). Notice of the assignment was promptly furnished to the Government by the plaintiff. The assignment was part of an arrangement whereby the plaintiff agreed to provide, and subsequently did provide, financing for the contractor's operations under the contract. This financing amounted to approximately 60 per cent of the invoice price of each carload of ore delivered by the contractor to the General Services Administration.

The contractor began to make deliveries under the contract at some time after May 5, 1953. By the time of the assignment to the plaintiff on October 8, 1954, some 150 invoices had been submitted by the contractor, and paid by the Government to the contractor, except for the amount covered by the assignment to the Export-Import Bank. The invoices for shipments after October 8, 1954, and up to April 17, 1955, were paid to the plaintiff, excepting the amount which went to the Export-Import Bank, and were paid at the 93-cent rate.

Invoices No. 285, dated April 23, 1955, through 293, dated May 10, were in the total amount of $20,140.34, at the 93-cent rate. Invoices 294, dated May 17, through 328, dated May 26, were in the total amount of $75,182.39, at the 93-cent rate.

On May 13, 1955, an employee of the General Services Administration advised the contracting officer that, because of a drastic devaluation of the Mexican peso on April 19, 1954, the Government had made overpayments of some $170,000 on the contract. This same employee on the same day telephoned the Export-Import Bank giving it the information which he had given the contracting officer. At some time between May 17 and May 20 a representative of the Export-Import Bank advised the contractor of the position which the Government was taking with regard to the devaluation of the peso.

In the meantime, between May 17 and May 26, the plaintiff had loaned the contractor $61,207.12 on ore that the contractor had delivered to the Government during that period. Not a dollar of this money would have been advanced by the

plaintiff if it had known that the Government did not intend to pay for the ore.

As we have said, the Government did not pay for any of this ore, nor for the ore that had been delivered on April 23 and thereafter. The plaintiff recovered, from collateral which had been pledged by a third person, enough to reduce the contractor's debt to it to $52,666.29.

As we have seen, deliveries under the contract did not begin until about the middle of 1953. On April 19, 1954, the peso was drastically devalued. Beginning then, the Government made the overpayments which, by May 13, 1955, were estimated to amount to possibly $170,000. The plaintiff, on October 8, 1954, took its assignment of the supplier's right to receive payments as ore was delivered to the Government. By that time there must have accrued a substantial part of the $170,000 overpayment. That meant that at the very time of the assignment, the contractor was under an obligation to deliver to the Government large quantities of ore without receiving any pay at all for it.

When the plaintiff, on October 8, 1954, notified the Government, as the statute required, that it had taken an assignment of the contractor's right to receive payments under the contract, the plaintiff did not know, had no reason to suppose, and was not charged with knowledge that the Government had large offsets against the contractor which it could assert against future deliveries. The Government did not know it, in the sense of being conscious of it. But the reason it was not conscious of it was because it had been careless in administering its contract with the supplier.

■ The purpose of the Assignment of Claims Act of 1940, as amended, 54 Stat. 1029, 65 Stat. 41, was to induce financial institutions to loan money to contractors to finance them in supplying goods to the Government. See Central Bank v. United States, 345 U.S. 639, 643, 646, 73 S.Ct. 917, 97 L.Ed. 1312; United States v. Hadden, 6 Cir., 192 F.2d 327,

329; Waxman v. United States, 112 F. Supp. 570, 125 Ct.Cl. 464, 500; S.Rep. No. 217, 82d Cong., 1st Sess., 1951-2 U.S.C.Con. and Adm.Service, p. 1414. We think that when the Government receives notice of such an assignment, it should have in mind the prime purpose of Congress in authorizing it, the purpose of enabling the Government to get its supplies without itself advancing the money to finance their production. If the Government knows that the right of the contractor to receive payments is worthless because the contractor has already been paid, the Government is under a duty to so advise the bank, so that the bank will not lend its money on worthless collateral. If the Government has the facilities for knowing that the collateral is worthless, and is unconscious of the fact only because of its carelessness in the handling of public money, we think it may not take advantage of its own negligence, and recoup its negligent overpayments by accepting supplies bought with money loaned by the assignee bank on the faith of the assignment.

■ We think the Government had no right to withhold payments from the plaintiff assignee for offsets accrued before the plaintiff took its assignment. The transaction should take a fresh start from the time of the assignment on October 8, 1954.

Beginning with the invoices submitted by the contractor after the assignment to the plaintiff, the 1951 amendment to the Assignment of Claims Act of 1940, 65 Stat. 41, 31 U.S.C.A. § 203 is applicable. That statute provides:

"In any case in which moneys due or to become due under any contract are or have been assigned pursuant to this section, no liability of any nature of the assignor to the United States or any department or agency thereof, whether arising from or independently of such contract, shall create or impose any liability on the part of the assignee to make restitution, refund, or repayment to the United States of any amount hereto-

fore since July 1, 1950, or hereafter [i.e., after May 15, 1951] received under the assignment."

For the invoices presented for shipments made after October 8, 1954 and up to April 17, 1955, the plaintiff made advances to the contractor and received payments from the Government at the 93-cent rate. The statute says that the fact that the contractor was overpaid, and was under a liability to make restitution, did not impose any liability on the plaintiff assignee to make "restitution, refund, or repayment" to the United States. Surely the purpose of the statute cannot be frustrated by the Government's paying itself by offset, instead of suing to get its money back. The statute is a drastic one, written to correct what experience had shown to be frequent occurrences in which assignees, having in good faith financed Government suppliers, found themselves subjected to refunds or offsets because of mistakes or discoveries made by Government fiscal officers.

The statute is so drastic that it is foreseeable that in some case, such as that of an obvious arithmetical mistake in a computation, it will be necessary, in the interest of justice to the Government, to depart from the words of the statute. This is not such a case. The Government made the contract, its attention was drawn particularly to the provision relating to the value of the peso at the time the contract was negotiated and on two occasions thereafter when the contract was modified. The plaintiff took the contract by assignment when it was a completed document, and it was not unnatural that it should suppose that the Government's fiscal officers knew what the Government had agreed to and would pay only what the contract called for. The plaintiff advanced only approximately 60 percent of the invoice price of the ore, which left a prudent margin which would have taken care of most fluctuations of the value of the peso. It had much less reason than the Government had to be alert to the details of the contract. We repeat that the case is not one which calls for a departure from the language of the 1951 statute.

The Government may not, then, obtain the "restitution, refund or repayment" of the money which it paid to the plaintiff under assignment, by the obvious device of calling it an offset against amounts subsequently due to the plaintiff.

That brings us to the invoices for the shipments made from April 23 to May 26, 1955, for which the Government has not paid anything. It should first be said with regard to the shipments received after May 13, that if the Government had been considerate of the interests of the plaintiff, which had made it possible for the Government to get the manganese which it needed, it would have advised the plaintiff that it wasn't going to pay any more invoices. That would have meant that the plaintiff would not have loaned any more money, and the Government would not have gotten any more manganese. Since, as the 1951 statute provides, the prior payments were a closed book, there is no reason why the Government should not have paid for these latter shipments at the price of the devalued peso. The contractor was at that time indebted to the plaintiff in the principal amount of $52,666.29, and the plaintiff is entitled to a judgment for the amount of the invoices, and at the price mentioned above, but the judgment may not be in excess of $52,666.29. The effect of our decision is that the Government, and not the plaintiff, will pay for the manganese ore which the Government received and used. Therefore, the plaintiff is entitled to recover and judgment will be entered to that effect with the amount of recovery to be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and DURFEE, Judge, concur.

LARAMORE, Judge (dissenting).

I cannot agree with the majority. I believe the proper and only unit price

838

that could be paid for the ore delivered under the contract was the lower figure to which the Mexican peso had been devalued.

Paragraph 4–b of the special terms, conditions, and specifications stated that the unit price of $0.93 was based on the then current exchange rate of 8.65 Mexican pesos to one United States dollar, and then provided that "any increase or decrease in such rate of exchange * * * shall be for the account of the Government." This provision could only have one reasonable meaning. The phrase "any increase or decrease in such rate of exchange," could only have referred to any future expansion or contraction of the ratio representing the relationship between the value of the peso and the value of the United States dollar. The phrase, "shall be for the account of the Government," could only reasonably mean that the United States should benefit from any expansion and bear the disadvantage of any contraction of the exchange rate ratio that might occur, the unit price in United States money being adjusted upward or downward to reflect any fluctuation in the exchange rate. Thus when the Mexican peso was devalued the United States was making overpayments solely due to a mistake of fact regarding the current rate of the peso in relation to the value of the United States dollar. To permit payment at any rate other than based on the devalued peso would be to change the contract provision to the detriment of the Government, which of course cannot be accomplished by any officer or agent of the Government. United States v. American Sales Corporation, D.C., 27 F.2d 389, 391–392, affirmed 5 Cir., 32 F.2d 141, certiorari denied 280 U.S. 574, 50 S.Ct. 29, 74 L.Ed. 625.

Furthermore, by simply reading the contract the plaintiff assignee could and should have known that payment would be made on the basis of the then value of the Mexican peso. Just because the assignee sat idle and accepted payment at a higher value would not obliterate the terms of the contract. If the assignee

bank did not know of paragraph 4–b it should have, and if the assignee bank did not know of the devaluation of the peso it should have. Its inaction could not give rise to a change in the contract such as to permit recovery here.

I would dismiss plaintiff's petition.

WHITAKER, Judge, joins in the foregoing dissenting opinion.