In the Matter of **TAILORTOWNE, INC.,** Bankrupt.

No. B–440–59.

United States District Court
D. New Jersey.

Sept. 25, 1961.

Kisselman, Devine, Deighan & Montano, by Neil F. Deighan, Jr., Camden, N. J., for petitioners.

Chester A. Weidenburner, U. S. Atty., Newark, N. J., by Frank J. Ferry, Asst. U. S. Atty., Camden, N. J., for respondents.

**MADDEN, District Judge.**

Before the Court at this time is a petition for review of an order of the Referee in Bankruptcy. The petitioners are the Woodbury Trust Company and the First National Bank of Woodbury (hereinafter referred to as "the Banks"), principal creditors of the bankrupt corporation. The Referee's order, along with the salient facts leading up to the same, are set out below.

On July 7, 1959, an involuntary petition in bankruptcy was filed against Tailortowne, Inc. (hereinafter referred to as "the bankrupt") by certain of its employees. Two days later the Referee held a hearing, at which attorneys for both the Banks and the petitioning employees were present.[1] During the hearing it was brought out that the bankrupt was deeply indebted to the Banks (which had been financing the bankrupt for some time); that its only remaining asset of any value was a contract with the United States Government for the manufacture of certain Air Force uniform jackets; that at the time the bankruptcy petition was filed the bankrupt had delivered slightly less than one-fourth of these jackets and had due and owing from the Government thereon a balance of approximately $16,000; and that under an assignment from the bankrupt, the Banks were to receive this money from the United States for advances made by them to the bankrupt.

During the course of the hearing it was suggested that a Receiver be appointed to continue performance under the Government contract in order to realize some further assets for the Banks and at the same time provide employment for the seventy or more employees of the bankrupt. The chief obstacle to this plan was the lack of adequate capital to meet current expenses necessary to complete work under the contract.

The Banks, while agreeing with the desirability of completing performance on

1. The hearing transcript indicates that a Mr. Burkhardt from the Office of the General Counsel for the Army Quartermaster Department was present as an observer.

the Government contract, were understandably wary of advancing any further funds. However, before the hearing ended, their attorneys agreed to explore the possibility of an arrangement whereby they could safely advance funds to an appointed Receiver to complete the work on the Government contract.

Four days later the Referee issued an order appointing a Receiver. The order also provided:

"* * * The Receiver is hereby authorized and directed to resume operations in the performance of debtor's Government contract subject to the control and direction of the Court.

"The Receiver is authorized to present to this Court, for approval by this Court, an agreement with [the Banks], by which sufficient funds to operate said debtor's business may be obtained."

Such an agreement between the Banks and the Receiver was in fact reached, and on July 15 it was confirmed by the Referee in an order which reads as follows:

"And Now To Wit, this 15th day of July, 1959, on motion of Joseph H. Enos, Receiver in the above-captioned matter, it is hereby ordered and decreed as follows:

"1. The Agreement between the Receiver and the First National Bank and Trust Company of Woodbury, New Jersey, and the Woodbury Trust Company of Woodbury, New Jersey, dated July 14, 1959, by which the Receiver is to receive from the said Bank and Trust Company certain sums for unpaid wage claims against the debtor and for certain sums to operate the business of said debtor to complete debtor's government contract, is hereby approved.

"2. In the event that, in the Receiver's opinion, he does not receive sufficient funds to operate the said business or if, in the Receiver's opinion, he does not receive sufficient funds to pay all tax liabilities including unemployment compensation, social security and withholding taxes, or if, in the Receiver's opinion, the operation of said business will result in a loss, then at the Receiver's opinion he may make immediate application to the court, for leave to cease operations, on notice to the said Bank and Trust Company, to the attorney for the bankrupt and to the attorney for the Philadelphia Joint Board Amalgamated Clothing Workers of America."

The agreement itself provided that the Banks would lend to the Receiver, upon Receiver's certificate, 75% of the net value of all goods shipped to the Government by the Receiver. In turn the Receiver was to use this money to pay current expenses, particularly wage claims against the bankrupt. The Banks had the discretion to withdraw their commitments upon written notice to the Receiver.

On July 17, the Receiver confirmed this agreement with the Contracting Officer and the Disbursing Officer of the United States Government. On July 20, three days after the Receiver confirmed the Referee's order with the Government officers, the Banks received the sum of $15,879.38 from the Government. This sum represented payment for jackets received by the Government *prior* to the filing of the petition in bankruptcy.

After completing his examination of the business the Receiver concluded that the business could not be operated successfully. On August 10, he accordingly made application for leave to cease operation of the business and to be released as Receiver. The Receiver never in fact operated the business of the bankrupt and, consequently, never made application to the Banks for any money.

The United States subsequently filed a petition in the Bankruptcy Court seeking the return of the $15,879.38 previously paid to the Banks. It argued that this sum was advanced *solely* in reliance upon the Referee's order which

contemplated resumption of the bankrupt's performance under the Government contract and that had they not so understood the order they never would have released the money.[2] After a hearing on the petition the Referee issued an opinion and order in which he found, in part, that:

> "* * * The Government did, and had a right to, rely upon this court's orders which were designed to open the bankrupt's place of business, whereby it paid over $15,879.38 to the Banks. The Government paid over the funds as part of the whole scheme of operation whereby it would secure the additional garments called for by the contract."

The Referee was of the opinion that to allow the Banks to retain this money at the expense of the Government (which he specifically found had relied upon the Court's order in turning it over) would violate the purpose of his order. Accordingly, he directed the Banks to return to the Government the sum of $10,521.57, an amount which he found to represent the actual loss which the Government sustained as a result of the bankrupt's inability to perform under the contract. It is this order which the present petition seeks to reverse in whole or in part.

### The Power of the Referee to Order the Return of the Money

At the outset, there are several facts which are important to a resolution of this case, and which we feel are beyond dispute.

First is the fact that had the Government paid the $15,879.38 under the assignment *prior* to notice of the bankruptcy petition the Banks unquestionably could have retained the full sum. We do not understand the Government to deny this fact. It follows from the clear command of the Assignment of Claims Act, 31 U.S.C.A. § 203, which provides in part:

> "* * * In any case in which moneys due or to become due under any contract are or have been assigned pursuant to this section, no liability of any nature of the assignor to the United States or any department or agency thereof, whether arising from or independently of such contract, shall create or impose any liability on the part of the assignee to make restitution, refund, or repayment to the United States of any amount heretofore since July 1, 1950 or hereafter received under the assignment. * * *"

Equally clear, we think, is the fact that *after* the petition in bankruptcy was filed the Government could have refused to make further payment under the contract, even if we were to assume that the $15,879.38 was absolutely due and owing at that time. This follows from the so-called "set-off" provisions of the Bankruptcy Act, 11 U.S.C.A. § 108, sub. a, which specifically provides that:

> "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid." [3]

Accepting the foregoing as true, the main question for this Court to decide is whether or not the Bankruptcy Court had the power to direct the Banks, under

---

2. See testimony at pages 34, 37 and 41–43 of the April 26th, 1960 hearing before the Referee.

3. At this point it might be well to point out a distinction between that part of Section 203, Title 31, U.S.C.A., which controls the *return* of money already paid out by the Government and the latter part of the same section which provides for the inclusion of a "no set-off" clause in Government contracts. The latter provision is limited in application to matters which arise "independently of such contract"—a fact of which the petitioners do not appear to be aware. (See page 13 of petitioner's brief and in particular their *partial* quotation of the latter part of Section 203 thereon.) This former provision has no such limitation.

this fortuitous set of facts, to return to the Government that portion of the $15,879.38 which represents the Government's claim against the bankrupt for breach or failure to complete performance under the contract.

The petitioners contend that it did not. They base this contention (1) upon the specific terms of the agreement between the Banks and the Receiver; (2) upon the provisions of the Assignment of Claims Act, 31 U.S.C.A. § 203 quoted in part earlier; and (3) upon the assertion that at the time the Government made its disputed payment to the Banks it had no claim in diminution of its loss for breach of contract by the bankrupt. Finally, they argue in the alternative that even if the Referee did have the power to order some of the money returned, the finding as to how much loss the Government sustained (i. e., $10,521.57) was based upon improperly admitted evidence.

An analysis of the facts and the law involved in this case—and particularly a review of that law governing the broad equitable powers of a Bankruptcy Court in dealing with a bankrupt's estate,[4] compels us to an opposite conclusion. Since we view the issue as one of discretion, we need not decide what this Court's action would have been in the first instance under the same circumstances.

The Bankruptcy Court by its disputed order has at least implicitly ruled that to allow the Banks to keep the $15,879.38 at the expense of the Government would violate the purpose of the Court's earlier order. The Receiver, acting by appointment of the Referee, confirmed the agreement between himself and the Banks with the Government's contracting officer and disbursing officer and supplied them with copies of the Referee's order. In reliance thereon, they immediately released the funds which they otherwise could have withheld. Under these unusual facts—keeping in mind that at that time it was only through the consenting authority of the Referee that any money could change hands—we think it within the broad equity powers of the Bankruptcy Court, in preserving not only respect for but confidence in its orders, to direct the return of this money.

In complete frankness we are moved to this conclusion more by the weakness of petitioners' claim than by any absolute right of the Government to the return of the money. Had the Referee concluded that the Government's reliance upon his order as assuring some continued operation of the bankrupt's business was not justified, and accordingly refused to order the return of the money, we doubt that this Court would be bound to interfere at the Government's request. It is precisely this finding of reasonable reliance (amply supported in the record) which goes to the heart of this case, that is, to the power of any Court to preserve respect for and confidence in its orders. That the necessity for such confidence is especially great in the case of those orders of a Referee in Bankruptcy which seek the cooperation of many interested parties in managing a bankrupt's assets, so as to maximize them for the benefit of creditors, need only be posited to be accepted.

Stated another way, the Referee could have incorporated in his order confirming the agreement between the Banks and the Receiver, a specific proviso that any monies which might be transferred in reliance upon the contemplated renewal of operations would be returned in the event of a delayed determination by the Receiver that continued operation of the bankrupt business was undesirable. Undoubtedly the Banks would not have championed such a provision. Nevertheless, they would have had no strong basis for objection *since they would thereby surrender nothing which they then had.* We pose such a possibility not in the slightest degree as a criticism of the Referee (for no one can forestall every possible turn of events under

4. See 11 U.S.C.A. § 11; Securities & Exchange Comm. v. United States Realty & Improvement Co., 1940, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293.

such circumstances) but rather to illustrate the fact that the retention of these assets by the Government always rested within the broad discretionary power of the Bankruptcy Court. Couple this fact with the Referee's finding (supported by the record) that to allow the Banks to keep this money at the expense of the Government would be contrary to the whole purpose of his earlier order and we have no doubt that the Bankruptcy Court had the power to act as it did.

Turning to the specific arguments of the petitioners, we think they are adequately explained by the foregoing rationale. Thus, petitioner's first point— which relies so heavily upon the language of the agreement between the Banks and the Receiver—fails to disturb the real basis for our holding. The Court agrees with their statement that there must have been an underlying debt for those goods already received by the Government; that the Banks had a valid assignment of this debt; and that the Banks were not in default under their agreement with the Receiver. Nevertheless, the petitioners grasp at a straw when, in summing up this first point, they argue, "If, as the Government contends, there were no moneys due by the Government, then, logically, *all* the moneys disbursed to the Bank should have been returned to the Government, and not just the sum of $10,521.57." Brief, p. 12. We do not understand the Government to seriously contend that there was no money owed by them for goods received prior to bankruptcy. If they did, we would reject such a contention. Nevertheless, this does not alter the fact that it was only through the power of the Referee, once bankruptcy ensued, that the petitioners ever acquired possession of the disputed funds. Add to this a finding that the Government's reliance upon some further operation of the bankrupt's business under the terms of the Referee's order was reasonable, and we think the situation fully justified the Bankruptcy Court's action.

The second point raised by the petitioners, which is a bit more trouble-some, is that the Assignment of Claims Act, 31 U.S.C.A. § 203, supra, specifically bars any repayment by the assignee under a Government contract. Assuming that this Act is applicable to the present assignment, the Court does not interpret it so broadly as to preclude the Bankruptcy Court's order here.

In pertinent part, Section 203 states as follows:

"* * * no liability of any nature of the assignor to the United States * * * whether arising from or independently of such contract, shall create or impose any liability on the part of the assignee to make restitution, refund or repayment to the United States * * *." 31 U.S.C.A. § 203.

The issue which this statute at once poses is this: Is it in fact a liability of the assignor-bankrupt which creates or imposes the duty on the part of the assignee-Banks to return the $10,521.57 to the Government?

As this Court views the case it is *not* a liability of the bankrupt which in any true sense creates or imposes a liability on the Banks to return this money. Rather it is the authority of the Bankruptcy Court, acting in equity to preserve the integrity of its own orders, which creates or imposes this duty. Such being the case, the Assignment of Claims Act is no obstacle to the present order.

Some may argue that this is indeed a fine distinction. Our reply would be that it is perhaps this power to make such distinctions (where justice demands it) that distinguishes the equity powers of a court. Equity indeed follows the law, but not blindly.

Nor, in reaching this conclusion, have we overlooked the case of United States v. Hadden, 6 Cir., 1951, 192 F.2d 327, which held that a literal interpretation of Section 203 precluded the Government from recovering money paid to an assignee by mistake. That case does not dissuade us from our present interpretation of Section 203, which we think is reasonable under the peculiar facts be-

fore us.[5] We need not now decide whether in an appropriate case, we would feel bound to accept that holding. See, for example, Newark Insurance Co. v. United States, Ct.Cl.1960, 181 F.Supp. 246.

Petitioner's third and final point rests upon the argument that at the time the Government paid the money to the Banks it had no claim in diminution of its loss for breach of contract because the contract had not yet been formally terminated. That the bankruptcy of a party to a contract prior to his completing performance thereon constitutes an anticipatory breach of the contract giving the other party the right to treat the contract as ended and at once commence an action thereon was long ago decided by the Supreme Court. Central Trust Co. of Illinois v. Chicago Auditorium Ass'n, 240 U.S. 581, 36 S.Ct. 412, 60 L.Ed. 811. The mere fact that the Government did not at once issue a formal notice of termination is of no moment. Obviously it was the Government's very reliance upon the Referee's order and a desire to cooperate in this matter (albeit for its own benefit) which prompted it to withhold such notice. Yet it is precisely such reliance which we find formed a justifiable basis for Bankruptcy Court's disputed order.

### The Finding as to Amount

In the alternative, the petitioners argue that the evidence adduced by the Government as to the amount of damages which they were entitled to was predicated upon incompetent and irrelevant evidence. We have carefully examined the record of the hearing held before the Referee on April 26, 1960. On pages 51 through 53 there is testimony by a Mr. G. F. Allan, Contracting Officer in the Philadelphia Quartermaster Depot, which we think constitutes sufficient basis for the Referee's finding as to damages. There was no objection made to this testimony by the petitioners. Nor was there any attempt whatsoever made to prove that the Government's losses were anything but what Mr. Allan testified to. Under the circumstances the petitioners cannot be heard to complain about this matter now. Krienke v. Illinois Central R.R., 7 Cir., 1957, 249 F.2d 840.

The order of the Bankruptcy Court directing the return of $10,521.57 by the Banks to the Government will, accordingly, be affirmed.

Counsel will prepare an appropriate order.

---

5. The present holding is a narrow one, based upon the peculiar facts of this case. We, therefore, have no fear that it will in any way undermine the basic aim of the Assignment of Claims Act, 31 U.S.C.A. § 203 et seq., which is to encourage private financing of Government contracts. See Central Bank v. United States, 1953, 345 U.S. 639, 73 S.Ct. 917 97 L.Ed. 1312.