**PRODUCE FACTORS CORPORATION**

v.

**The UNITED STATES.**

No. 694–71.

United States Court of Claims.

Oct. 13, 1972.

James J. Orlow, Philadelphia, Pa., attorney of record, for plaintiff.

Judith A. Yannello, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and DAVIS,

SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR LIMITED SUMMARY JUDGMENT

COWEN, Chief Judge:

Plaintiff, Produce Factors Corporation, an assignee of proceeds payable under Government contracts, filed this suit against the United States claiming damages totalling $74,149.57 for an alleged breach of contract. The case is before the court on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment limited to the issue of liability. We have concluded that plaintiff is not entitled to any recovery.

The material facts are not in dispute. Plaintiff is a factor; it is in the business of lending money to businessmen on the security of assignments of the borrowers' accounts receivable. In February of 1968, plaintiff entered into a financing arrangement with Terminal Warehouses, Inc., (Terminal), a Government contractor, whereby plaintiff received an assignment of proceeds to become payable by the United States upon Terminal's performance of its contractual obligations. Specifically, Terminal had a formal written contract with the United States Air Force at McGuire Air Force Base, New Jersey, for the local movement and storage of the household goods of service personnel. Terminal also had an informal agreement with the United States Army at Fort Dix, New Jersey, for similar services. Under the terms of the assignment, Terminal was to submit to plaintiff all invoices and schedules of invoices representing performance of work under the above contracts, together with receipts signed by service personnel evidencing completion of each job. Plaintiff was to advance to Terminal 88 percent of the amounts payable by the United States on each invoice, and forward the invoices to the Army and Air Force for processing and payment directly to plaintiff. The ostensible advantage of this arrangement to Terminal was an immediate cash flow upon performance of services for the United States, while plaintiff, after the normal 30- to 45-day period required by the Government to process the invoices, would receive the full amounts earned by Terminal's performance. Prior to making any payments to Terminal, plaintiff verified the existence of the contracts and notified the appropriate Army and Air Force officials in order to create a valid, enforceable assignment of claims against the United States under the Assignment of Claims Act of 1940, as amended, 54 Stat. 1029, 31 U.S.C. § 203, 41 U.S.C. § 15 (1970).

Between March 4, 1968 and June 13, 1968, Terminal submitted to plaintiff for payment approximately 396 invoices showing a total amount earned by performance of $89,636.64. On the strength of these invoices, plaintiff advanced to Terminal a total of $79,975.38, approximately $50,000 of which was allocated to Air Force invoices, the remainder to Army invoices. From time to time, plaintiff mailed groups of invoices to the Army and Air Force for processing and payment; prior to mailing plaintiff placed the following endorsement on the face of each invoice:

This bill is assigned to and payable in Philadelphia funds only to our factors:

PRODUCE FACTORS CORPORATION

1601 Walnut Street

Lo 4–5080 Philadelphia, Pa. 19102

to whom notice must be given of any merchandise returns or claims for shortage, non-delivery, or for other grounds.

Assignment Acknowledged

s/ JOEL DREER

Authorized Signature [1]

---

1. Joel Dreer was then president of Terminal.

It does not appear that plaintiff placed any other information regarding its interests on or with the invoices.

As subsequent events were to disclose, however, very few of the invoices turned over to plaintiff by Terminal and forwarded by the former to the Government represented work actually performed by Terminal. Beginning in April 1968, Terminal began submitting to plaintiff, along with a small number of true invoices, a large number of entirely fictitious invoices, representing jobs neither requested by the Air Force or Army nor performed by Terminal. In fact, on all the invoices submitted by plaintiff to the Government, plaintiff ultimately recovered only $15,433.83 as contract proceeds or otherwise. Plaintiff concedes that the latter amount includes all the proceeds actually earned by Terminal for performance in accordance with its contractual arrangements with the Army and Air Force.

Terminal was able to conceal its fraudulent activities from plaintiff (and the Government) until the middle of June 1968, by retrieving the false invoices directly from the Army and Air Force. An employee of Terminal apparently made periodic visits to the Army and Air Force finance offices and represented to the employees there that errors had been made in the preparation of certain invoices, or that some of the invoices had been misdirected to that office. The Government personnel readily returned the invoices requested (the false invoices) to Terminal; thus, none of Terminal's fictitious invoices were ever processed by the Government. Eventually, plaintiff's suspicions were aroused as it continued to receive only a fraction of the proceeds thought to be due. When inquiries to the Army and Air Force disclosed that only a small number of invoices were in process, plaintiff's president confronted Terminal's president with that information; and on June 17, 1968, the latter confessed to the fraud.

Joel Dreer, Terminal's president, was subsequently convicted in Federal court of criminal charges stemming from the fraudulent activities described herein. Terminal is apparently insolvent and without assets. Thus, it is unlikely that plaintiff will ever be able to recover any part of its losses from Terminal.

It is not alleged that either plaintiff or the United States had any knowledge of Terminal's fraud prior to June 17, 1968.

Plaintiff does not contend that it is entitled to any further proceeds under Terminal's contracts, acknowledging that it has been paid everything earned by Terminal's performance of actual services. Plaintiff's position is rather that an implied contract was created between itself and the United States, when the Government received notice of plaintiff's assignment of Government contract proceeds and when the Army and Air Force accepted delivery of the invoices directly from plaintiff. In plaintiff's view, when the Government received these invoices it thereafter had an obligation to deal solely with plaintiff on all matters regarding the invoices; or at least to notify plaintiff if the Government had any dealings with Terminal relating to the invoices. Thus, plaintiff urges that the Government breached its contractual obligations to plaintiff in the following respects:

(a) Failure to return the invoices if invalid to petitioner in the normal course of business.

(b) Delivery of the assigned invoices to a representative of the assignor directly and without regard to petitioner's interests.

(c) Failure to notify petitioner of any irregularity or invalidity in the invoices it had submitted for payment during the same period when regular payment of valid invoices was being made. (Petition para. 16.)

The thrust of plaintiff's argument is that it continued to advance funds to Terminal in reliance upon the receipt by the Government of the earlier invoices and in the absence of any notice that Terminal was retrieving certain in-

voices. Had it received such notice, plaintiff appears to argue, it could have withheld further advances pending determination of the reasons for Terminal's retrieval of some of the earlier assigned invoices. Plaintiff also asserts that the Government is estopped to deny its liability to plaintiff on the basis of either an equitable estoppel or a promissory estoppel.

We have concluded that the plaintiff, whose relationship with the United States arose only because of its status as an assignee under the Assignment of Claims Act, as amended, did not have privity of contract or any contractual relationship with the Government. Therefore, its breach of contract action cannot be maintained. Plaintiff had only the rights of an assignee of Government contract proceeds under the assignment statute. We also find that the Government did not violate any duty it may have had to plaintiff arising under the Assignment of Claims Act.

Prior to 1940, any attempted assignment of claims against the United States, or of any interest in a Government contract, was absolutely null and void, at least against the Government. R.S. §§ 3477, 3737 (1875) (now 31 U.S.C. § 203, 41 U.S.C. § 15). One of the major purposes of this prohibition was stated by the court in Pittman v. United States, 116 F.Supp. 576, 580, 127 Ct.Cl. 173, 180 (1953), cert. denied, 348 U.S. 815, 75 S.Ct. 23, 99 L.Ed. 642 (1954):

> * * * The Anti-Assignment statute was enacted for the purpose of preventing third parties, with whom the Government was not in privity, from acquiring an enforceable interest in a claim against it. * * *

Consequently, the Government was assured that it would have to deal only with the original claimant or contractor, and that it would preserve all defenses available to the United States relating to claims against it. Id.

The Assignment of Claims Act of 1940, 54 Stat. 1029, 31 U.S.C. § 203, as amended, continues the general prohibition against assignments, but creates an exception to it by permitting assignments of Government contract proceeds to certain types of lending institutions; in relevant part, the statute provides the following:

> All transfers and assignments made of any claim upon the United States, * * * shall be absolutely null and void * * *.

> The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financing institution, * * *: *Provided,*

> * * * * * *

> 2. That in the case of any contract entered into after October 9, 1940, no claim shall be assigned if it arises under a contract which forbids such assignment;

> 3. That unless otherwise expressly permitted by such contract any such assignment shall cover all amounts payable under such contract and not already paid, shall not be made to more than one party, and shall not be subject to further assignment, * * *;

> 4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with (a) the contracting officer or the head of his department or agency; * * * and (c) the disbursing officer, if any, designated in such contract to make payment.

> Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to

this section, shall constitute a valid assignment for all purposes.[2]

The purpose of the 1940 enactment was to "make it easier for government contractors to secure financing for carrying out obligations to the Government to the end that government contracts might be speedily and effectively performed." Waxman v. United States, 112 F.Supp. 570, 588, 125 Ct.Cl. 464, 500 (1953). Additionally, the act implemented the Congressional preference that Federal contracts be financed by private rather than public capital. Chelsea Factors, Inc. v. United States, 181 F.Supp. 685, 690, 149 Ct.Cl. 202, 210 (1960). Thus, the only effect of the Assignment of Claims Act of 1940 was to remove the anti-assignment bar so as to permit contractors to finance their Federal contracts upon the security of assignments of the contract proceeds to be earned thereunder. Royal Indem. Co. v. United States, 93 F.Supp. 891, 895–896, 117 Ct.Cl. 736, 749 (1950). While the assignee-lending institution indirectly benefits the Government through financing the contractor's performance, such indirect benefits do not serve to create privity of contract with the United States. Cf., H. Herfurth, Jr., Inc. v. United States, 89 Ct.Cl. 122 (1939). The Government looks exclusively to the contractor-assignor for all matters relating to performance of the contract. McPhail v. United States, 181 F.Supp. 251, 254–255, 149 Ct.Cl. 179, 184–185 (1960). The rights of the assignee are "limited to its right to receive money under the contract." Wyoming Nat'l Bank of Wilkes Barre, Pa. v. United States, 292 F.2d 511, 514, 154 Ct.Cl. 590, 594–595 (1961). The assignee has only a limited interest in the financing aspects of the contract, not the performance aspects. See, Gilmore, The Assignee of Contract Rights and His Precarious Security, 74 Yale L.J. 217, 236 (1964). Further, the assignee's rights to payments of contract proceeds are en-

tirely dependent upon, and inseparable from, performance by the contractor of his contractual obligations. National City Bank of Evansville v. United States, 163 F.Supp. 846, 852, 143 Ct.Cl. 154, 163 (1958); Royal Indem. Co. v. United States, supra, 93 F.Supp. at 895, 117 Ct.Cl. at 748; Modern Indus. Bank v. United States, 101 Ct.Cl. 808, 820–821 (1944). See also, 4 A. Corbin, Law of Contracts § 895 (1951), § 896 (Supp. 1971). As a general rule respecting proceeds under Government contracts, "an assignee making advancements on the faith of such assignment assumed the risk incident to the failure of such contractor to fulfill his contractual obligations." Hardin County Sav. Bank v. United States, 65 F.Supp. 1017, 1022, 106 Ct.Cl. 577, 599 (1946). Thus, it has been held that "[w]hen a question regarding assignments as they affect the Government arises, the general law of assignments must govern." Central Nat'l Bank of Richmond, Va. v. United States, 91 F.Supp. 738, 740, 117 Ct.Cl. 389, 397 (1950). In that same case, we stated:

Plaintiff's assignment was made pursuant to the Act of 1940 and notice thereof was given in the manner and to the officials as required. Having so complied with the act, plaintiff is entitled *to that degree of protection ordinarily given to an innocent assignee who acts in good faith.* (91 F. Supp. at 740, 117 Ct.Cl. at 397–398.) [Emphasis added.]

■ Terminal's assignment to plaintiff of the right to contract proceeds could not, and did not, create any contractual relationship whatsoever between plaintiff and the United States. The latter's only contract was with Terminal; plaintiff's sole *contractual* relationship was also with Terminal. Whatever obligations the United States accrued with regard to plaintiff arose exclusively under the Assignment of

2. 41 U.S.C. § 15, specifically dealing with transfers of interests in Government contracts, validates the same types of assignments as does 31 U.S.C. § 203 in identical language.

Claims Act; it is in that light that plaintiff's assertion of liability against the United States must be viewed.

 When the Government receives notice that an assignment of proceeds under a Government contract has been made, it can no longer discharge its payment obligation under the contract by paying the contractor. The Government has only a reasonable time to determine the validity of the assignment; thereafter the assignee is entitled to all amounts earned by the contractor's performance. Central Nat'l Bank of Richmond, Va. v. United States, *supra,* 91 F.Supp. at 741, 117 Ct.Cl. at 398–399. However, the assignee's rights are subject to, *inter alia,* defenses arising under the contract which the Government could have asserted against the contractor absent the assignment, such as non-performance or failure of consideration. If the contractor could recover nothing, then in most cases the assignee, standing in the shoes of the contractor, is entitled to nothing. Wyoming Nat'l Bank of Wilkes Barre, Pa. v. United States, *supra,* 292 F.2d at 514, 154 Ct. Cl. at 594–595; Royal Indem. Co. v. United States, *supra,* 93 F.Supp. at 895, 117 Ct.Cl. at 748; 4 A. Corbin, Law of Contracts § 892 (1951); Restatement (Second) of Contracts § 168 (Tent.Draft No. 3, 1967).

 The assignee of Government contract rights is, of course, entitled to certain governmental protection of its interests. If at the time it receives notification of an assignment, the Government knows that the assignee's collateral is worthless, the Government must convey that information to the assignee so that he will not advance funds on the strength of proceeds that will never come due. And if the Government failed to discover such information solely because of its own lack of diligence, the Government may become liable to the assignee where the contractor could not have recovered any proceeds. Mercantile Nat'l Bank at Dallas v. United States, 280 F.2d 832, 836, 150 Ct.Cl. 700, 707 (1960) (prior overpayments to the contractor). Such a rule does not assist the instant plaintiff, because it is not alleged that the Government had any actual or constructive notice of Terminal's fraud. Terminal took great pains to ensure that the Government never had the opportunity to examine the false invoices. It is also clear, on the facts alleged, that between plaintiff and the Government, the former had superior knowledge regarding the invoices that should have aroused suspicion that something was amiss. Terminal's contract with the Air Force was for a term of one year (January 1 through December 31, 1968) and had an estimated *annual* value, stated in the contract, of $13,519.50. Yet in slightly more than *3 months* plaintiff advanced to Terminal a total of approximately $50,000 on Air Force invoices alone. We think that such a glaring disparity between estimated annual value and purported performance for one quarter should have induced a reasonably prudent business concern making loans against that performance to initiate inquiries into the actual level of performance.

 Plaintiff correctly contends that an obligor (here the United States) may be prevented from asserting defenses against an assignee, that could have been raised against the contractor, on the basis of equitable estoppel. That doctrine has been expressed in the following terms:

> * * * To create such an estoppel, the obligor must have so conducted himself as to induce the assignee to believe that the defense or counterclaim that is later asserted did not exist and to change his position materially in reasonable reliance thereon. Also, the obligor must have had reason to foresee some such change of position in reliance. * * * (4 A. Corbin, Law of Contracts § 899 (1951).)

*See also,* Restatement (Second) of Contracts, Explanatory Notes to § 168, comment *g* at 252 (Tent.Draft No. 3 1967). However, plaintiff's claim of equitable estoppel against the Govern-

ment must be rejected on the facts before us. Plaintiff's only argument is that the Government, knowing of plaintiff's interest in the invoices, should not have permitted Terminal to retrieve some of the invoices without at least informing plaintiff, since the Government knew or should have known that plaintiff would continue to advance funds to Terminal in the absence of any knowledge respecting possible defects in the earlier invoices. There are several reasons why this argument must fail.

First, as discussed above, it should be emphasized that the assignee's interest is in the fund created by contractor performance under its contracts with the United States. The invoices are the contractor's representation that performance has been rendered and that payment is due thereon. Only after the Government has processed the invoices and authorized payment of the amounts claimed, does the assignee's interest become significant. The contractor renders the performance; it is the contractor, not the assignee, who normally is exclusively in possession of the information required to prepare the invoices. Routine errors in billing and in the preparation and submission of invoices are commonplace. It is not in the interest of either the Government or the assignee that incorrect invoices undergo processing, and it is the contractor who will usually make the corrections. Therefore, it cannot be reasonably asserted that the Government should have prevented Terminal from recalling certain invoices for correction; and it would be equally unreasonable to require the Government to notify the assignee of such routine matters which do not bear any obvious relationship to the assignee's right to proceeds. This is true whether it was the assignee or the assignor who forwarded the invoices to

the Government.[3] The Government looks to the contractor on all performance-related matters. Preparation and correction of invoices, as opposed to payments of amounts due under the invoices, are performance related. Further, there is no conflict of interest problem that would cause the Government to hesitate to return the invoices to the contractor. When the Government has been duly notified of a valid assignment, the contractor cannot thereafter recover any proceeds under the affected contracts and a second assignment is invalid under the Act. Thus, it would normally gain the contractor nothing to withhold the invoices from the Government or the assignee.

Plaintiff relies heavily on the wording of the endorsement placed on the invoices, urging that the Army and Air Force were thereby notified that they should deal only with the assignee on matters respecting the invoices. However, the endorsement only states that the assignee should receive notice of "merchandise returns or claims for shortage, nondelivery, or for other grounds." These are substantive matters of performance, involving defective performance or failure of consideration —issues that could give rise to defenses in favor of the Government against claims to proceeds by either the contractor or his assignee. Since these types of defenses could adversely affect the value of the assignee's security in contract proceeds, it is only sound business practice for an assignee to request notification from the obligor of faulty performance by the assignor. An endorsement like the one used by plaintiff is intended as a safeguard against nonnotification regarding faulty performance. However, it cannot be said that return of invoices to the assignor for routine correction or resub-

---

3. Plaintiff urges that the Government knew or should have known that the invoices were submitted directly by the plaintiff. This assertion is questionable in view of the fact that it is not alleged that plaintiff placed any writings on or with the invoices prior to delivery other than the above-quoted endorsement. The endorsement is, however, neutrally worded and could have been equally well added by the assignor. However, it makes no difference who mailed the invoices in view of our resolution of the issues.

mission to the proper office has any relation to the existence of the types of defenses indicated in the plaintiff's endorsement.

 For these reasons, it is clear that the Government did not violate any obligation it owed the plaintiff under the Assignment of Claims Act, as amended; and that the Government did not disregard plaintiff's interests in a way that would give rise to an equitable estoppel against the Government. Plaintiff's assertion of promissory estoppel is without merit. The Assignment of Claims Act, as noted, merely removes the anti-assignment bar to permit Government contractors to more readily obtain private financing on the strength of future contract proceeds. Acknowledgment of an assignment and the receipt of invoices thereunder by the Government do not create such an obligation to the assignee as plaintiff claims, since the assignee's right to proceeds is directly conditioned on contractual performance by the assignor. The plaintiff's dilemma is unfortunate, but where the Government neither caused the losses nor aggravated them, and did not act inequitably with respect to plaintiff's interests, plaintiff cannot look to the Government for a recovery.

 Plaintiff's final argument is that if the Government had wanted to avoid the liability asserted here, it could have refused to accept the assignment in the beginning. The contention is fallacious. Both 31 U.S.C. § 203 and 41 U.S.C. § 15 specifically provide that "any assignment pursuant to this section, shall constitute a valid assignment for all purposes." If an assignment permitted by the Act is executed by the parties, and notice given the Government, as required by the terms of the Act, nothing in the law suggests that the Government could arbitrarily refuse the assignment. Such action would be in derogation of the obvious intent of Congress that the Act serve as a vehicle to encourage private financing of Government contracts. Certainly we do not understand plaintiff to assert that its assignment from Terminal was defec-

tive in a way that gave the Army or Air Force cause to reject the assignment. Further, both statutory sections provide:

1. That in the case of any contract entered into prior to October 9, 1940, no claim shall be assigned without the consent of the head of the department or agency concerned * * *. (31 U.S.C. 203; 41 U.S.C. 15 (1970).)

The absence of such a provision regarding contracts executed subsequent to October 9, 1940, suggests that no agency or departmental permission is required to create an assignment binding on the Government. *See, generally* Central Nat'l Bank of Richmond, Va. v. United States, *supra*. A case such as Maffia v. United States, 163 F.Supp. 859, 143 Ct.Cl. 198 (1958), is distinguishable. There the assignment in question was barred by the anti-assignment statute, but it was held that since that statute was enacted solely for the benefit of the United States, the Government had the option to reject or accept the purported assignment.

For the reasons stated, defendant's motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied. Plaintiff's petition is dismissed.