**MERCHANTS NATIONAL BANK OF MOBILE**

v.

**The UNITED STATES.**

**No. 565–80C.**

United States Court of Claims.

Sept. 8, 1982.

Alan C. Christian, Mobile, Ala., for plaintiff; Brock B. Gordon, Mobile, Ala., attorney of record; Johnstone, Adams, May, Howard & Hill, Mobile, Ala., of counsel.

Allen C. Peters, Arlington, Va., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant; Carmen M. Shepard, Dept. of Justice, and J. Stephen Brophy, U.S. Coast Guard, Washington, D.C., of counsel.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and NICHOLS, Judge.

ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

The plaintiff bank seeks to recover the unpaid balance under a contract by which the plaintiff's assignor, Concept National, Inc. ("Concept"), agreed to furnish goods to the government. The bank received the assignment as security for a loan it made to Concept to finance the transaction. The financing took the form of an international letter of credit. The goods were manufactured in Korea, and the government refused to pay for part of the goods upon their delivery in the United States, because they were defective. The plaintiff does not deny that the goods were defective but contends that the government is equitably estopped from raising that claim because it inspected and accepted the goods in Korea, knowing that the inspection certificates it issued would induce the bank to pay under the letter of credit.

Both parties have moved for summary judgment, and we heard oral argument. We hold for the plaintiff.

I.

A. In 1977, the Coast Guard awarded to Concept two contracts to furnish buoy chains and bridles for a total price of $338,-000. Concept subcontracted the work to Bon Chemical Co., a Korean company. To finance the contract, the plaintiff issued, on Concept's behalf, an irrevocable letter of credit in Bon Chemical's favor. In return, Concept assigned its rights under the contract to the plaintiff pursuant to the Assignment of Claims Act, 31 U.S.C. § 203, 41 U.S.C. § 15 (1976).

The contracts, copies of which the bank received, provided that "Inspection will be performed by Government personnel at" Bon Chemical's plant in Korea. They required the contractor to furnish to the inspector "an affidavit certifying that the material used in the manufacture" of the chains and bridles "has been tested and found acceptable" as conforming to the contract specifications. The contract further provided that contracts involving more than $25,000 (as this one did) "will be limited to a maximum of three (3) inspections," of which the second and third would "be made for the convenience of the Contractor." The contract required the contractor, "[w]hen material has been accepted after inspection and shipment authorized," to forward specified shipping documents to a designated destination.

The contract further provided that at the "time of each INSPECTION of supplies under the contract, the Contractor shall prepare and furnish to the Government Inspector, a Material Inspection and Receiving Report in the manner and to the extent required by" the Armed Services Procurement Regulations. This report, known as Form 250, is a "multi-purpose report" frequently used in government procurement. 32 C.F.R. App. I § I–103(a) (1981).

Although the letter of credit is not in the record, apparently there is no dispute that one of the documents Concept was required to furnish to the bank to obtain payment was the signed Form 250 covering the goods for which payment was sought. An affida-

vit by Glenn D. Sigler, the bank's assistant vice president at that time who was responsible for financing the Concept contract, stated that

[i]n connection with the request of Concept-National, Inc., MNB contemplated the requirement that an independent international inspection firm, Superintendence Company, would test and inspect the goods to be supplied under the contract and that their certificate of such inspection would be a necessary document under the terms of the irrevocable letter of credit to be issued by MNB to finance the purchase of the goods by Concept.

He further stated that after he had several conversations with the contracting officer of the Coast Guard, Mr. Forgione, concerning the requirement of a "certificate of inspection and acceptance," Mr. Forgione told Mr. Sigler

that the Coast Guard would inspect and accept the goods as conforming to contract at the origin of their shipment in Korea and would issue its certification, DD Form 250, Material Inspection and Receiving Reports to that effect. Consequently, in reliance on the Coast Guard's express statements, MNB required as a necessary document under its irrevocable letter of credit a DD Form 250, Material Inspection and Receiving Report as to each lot shipped from Korea and did not require an independent inspection and certification by Superintendence Company.

The government filed an affidavit by Mr. Forgione, who stated that although he had informed the bank that the "Coast Guard would conduct an inspection of the contract goods in Korea," he never told the bank that under the contract "final inspection and acceptance of the contract goods would take place in Korea."

The contracts incorporated many specifications, some of which also dealt with inspection of the goods. One of these provided: "Acceptance by the Government inspector shall be provisional subject to final acceptance by the contracting officer." The contracts also incorporated section 5(d) of Standard Form 32: General Provisions (Supply Contract): "Except as otherwise provided in this contract, acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud." See 32 C.F.R. § 7–103.-5(a) (1981).

B. The goods were manufactured in Korea and, pursuant to the contract, the Coast Guard inspected them there before shipment to points in the United States. After inspection, the Coast Guard issued the Form 250 inspection reports. These reports stated: "ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents." No exceptions were noted thereon or in any supporting documents.

Concept presented the inspection reports and other documents to the plaintiff which paid under the letter of credit. The government, in turn, paid the plaintiff more than $160,000 of the $267,000 price of the first contract.

When the Coast Guard put the chains and bridles into service, they did not perform as the specifications required. An independent testing laboratory tested the chains and found them to be defective and not in accordance with the specifications. At a subsequent meeting with Coast Guard representatives, Concept and Bon Chemical both agreed that the chains contained latent defects. Although the two firms agreed to replace the chain with chain that met the specifications, they did not do so.

In July 1979, the government terminated the contract for default. The government refused to pay the plaintiff the balance of the contract price. It also sued Concept in the United States District Court for the Northern District of Georgia for breach of contract. The plaintiff was allowed to intervene as of right, and filed as a counterclaim in that suit the claim it now presents here. The district court dismissed the counterclaim, however, as outside its jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a)(2) (Supp. IV 1980), because it sought more than $10,000.

Approximately six months after the district court had dismissed the plaintiff's counterclaim, the United States moved for partial summary judgment against Concept. Concept filed no response and the court entered summary judgment for the United States against it for $724,564. *United States v. Concept National, Inc.,* No. C79–1425A (N.D. Ga. May 18, 1981).

After the district court dismissed the plaintiff's counterclaim, and before judgment was entered in that suit, the plaintiff filed its petition here seeking the balance of the contract price of $99,839. The government counterclaimed for the amount it has paid the plaintiff under the contract, but it dismissed that claim.

## II.

■ Under the Assignment of Claims Act, an "assignee's rights to payments of contract proceeds are entirely dependent upon, and inseparable from, performance by the contractor of his contractual obligations." *Produce Factors Corp. v. United States,* 199 Ct.Cl. 572, 581, 467 F.2d 1343, 1348 (1972) (citations omitted). The assignee who finances a transaction assumes the risk of nonperformance by the assignor. *Id.,* 467 F.2d at 1348.

■ The government argues that since the goods concededly were defective and since the district court held that Concept was at fault when the court granted summary judgment for the government, under these principles the plaintiff cannot recover. The plaintiff counters that the basis of its claim is not that Concept could recover from the government, but that the government is equitably estopped from disavowing the statement in the inspection reports that upon inspection it found the goods to conform to the contract. This is so, the plaintiff argues, because when the government issued the inspection reports, it was aware that the plaintiff would make payment under the letters of credit on the basis of those reports and the plaintiff did exactly that. We think the plaintiff's position is well taken.

In *Produce Factors,* the court recognized that an assignee of a government contract could assert that the government is equitably estopped from asserting against it defenses the government could have successfully invoked against the contractor but rejected the equitable estoppel claim on the facts of that case. *Id.* at 583, 467 F.2d at 1349–50.

This court has said that

the following four elements must be present in order to establish an estoppel:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Emeco Industries, Inc. v. United States,* 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973) (citing *United States v. Georgia-Pacific Co.,* 421 F.2d 92, 96 (9th Cir. 1970)); *accord, Singer Co. v. United States,* 217 Ct.Cl. 225, 246, 576 F.2d 905, 917 (1978); *Russell Corp. v. United States,* 210 Ct.Cl. 596, 613, 537 F.2d 474, 485 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Atlantic National Bank v. United States,* 210 Ct.Cl. 340, 348, 536 F.2d 1354, 1359 (1976).

The plaintiff without question satisfies the last three of those conditions. The dispute is over the first condition. The government contends that when it issued the inspection report, the fact of which it must have had knowledge was that the goods were defective and that since the defects were latent, it could not have known about them.

We hold, however, that in the particular circumstances at issue in this case, the government did "know the facts" for purposes of equitable estoppel. When the government issued the inspection report, it did not know that the goods were defective, since those defects were discovered only after the Coast Guard put the chains into service. The government did know, however, that if it issued the inspection reports

certifying that it had inspected the goods and that they conformed to the contract, the plaintiff would pay under the letter of credit in reliance upon the certificates. The affidavit of Mr. Sigler, the vice president of the bank, stated that he had discussed with the contracting officer, Mr. Forgione, "the securing of MNB's financial position with respect to the issuance of the irrevocable letter of credit by requiring as a necessary document to said letter of credit the certification of inspection and acceptance," and that Mr. Forgione had told Mr. Sigler that

> the Coast Guard would inspect and accept the goods as conforming to contract at the origin of their shipment in Korea and would issue its certification, DD Form 250, Material Inspection and Receiving Reports to that effect. Consequently, in reliance on the Coast Guard's express statements, MNB required as a necessary document under its irrevocable letter of credit a DD Form 250, Material Inspection and Receiving Report as to each lot shipped from Korea. . . .

Although the government filed an affidavit by Mr. Forgione that he never told Mr. Sigler or anyone else connected with the plaintiff that "final inspection and acceptance of the contract goods would take place in Korea," the affidavit did not contradict the statements in Mr. Sigler's affidavit set forth above. Indeed, Mr. Forgione seemingly confirmed those statements since he stated that he had informed the plaintiff that the Coast Guard would conduct "an inspection of the contract goods in Korea." The government did not submit any affidavit or other documents to contradict these statements of Mr. Sigler, and we therefore accept them as accurately describing what happened. Ct. Cl. R. 101(f).

Although the certificate in the inspection reports stated that the goods had been inspected and that they conformed to the contract "except as noted herein or on supporting documents," the Coast Guard noted no exceptions. Since the inspection reports met the requirements of the letter of credit, the plaintiff was required to and did pay under the letter when Concept presented the reports to it. As indicated, the govern-ment knew when it issued the certificates that they would be used for that purpose.

The fact that the contract between Concept and the Coast Guard incorporated specifications and provisions stating that "Acceptance by the Government inspector shall be provisional subject to final acceptance by the contracting officer," and "that acceptance shall be conclusive except as regards latent defects . . ." cannot avoid the application of equitable estoppel against the government.

The issuance of the inspection reports by the Coast Guard was the critical step as far as the plaintiff's payment under the letter of credit was concerned. Once those reports were issued, the plaintiff had no choice but to pay under the letters of credit when they were presented to it. *Marino Industries Corp. v. Chase Manhattan Bank, N.A.,* 686 F.2d 112 (2d Cir. 1982). The government was aware that that would be the consequence of issuing the report. The bank could not have refused to pay under the letters of credit on the ground that despite the reports the government might ultimately refuse to pay if latent defects subsequently were discovered. Indeed, the government itself recognized the effect of the inspection reports, since it paid for the first shipments of goods without any further inspection of the goods upon their arrival in the United States.

In short, we hold that the government is equitably estopped from denying the statements in its inspection reports that the goods conformed to the requirements of the contract. It therefore is required to pay the plaintiff the amount the latter paid under the letter of credit in reliance upon those reports.

CONCLUSION

The plaintiff's motion for summary judgment is granted, and the defendant's motion for summary judgment is denied. Judgment is entered for the plaintiff for $99,839.