824 F.2d 1573
 40 Ed. Law Rep. 1152
 CHULA VISTA CITY SCHOOL DISTRICT, Poway Unified School
District, and Sweetwater Union High School
District, Plaintiffs/Cross-Appellants,
v.
William J. BENNETT, Secretary of Education, Defendant/Appellant.
 Appeal No. 86-1097.
 United States Court of Appeals,
Federal Circuit.
 July 20, 1987.
 
 Howard S. Scher, Dept. of Justice, of Washington, D.C., argued for defendant/appellant. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., Peter K. Nunez, U.S. Atty. and Anthony J. Steinmeyer. Also on the brief was John R. Mason, Office of Gen. Counsel, U.S. Dept. of Educ., of Washington, D.C., of counsel.
 Donald Jay Solomon, of San Diego, Cal., argued for plaintiff/cross-appellants Chula Vista.
 Leonard Pollard, II, of San Diego, Cal., argued for plaintiff/cross-appellants Poway & Sweetwater. With him on the brief were Lloyd M. Harmon, Jr., County Counsel and Daniel J. Wallace, Chief Deputy.
 Clifford D. Weiler, Brown and Conradi, of San Diego, Cal., was on the brief for amicus curiae, Coronado Unified School Dist., Hueneme School Dist., South Bay Union School Dist. and Travis Unified School Dist.
 Before DAVIS, Circuit Judge, BALDWIN, Senior Circuit Judge, and SMITH, Circuit Judge.
 EDWARD S. SMITH, Circuit Judge.
 
 
 1
 The United States District Court for the Southern District of California held the $50 Rule, used by the Secretary of Education to evaluate applications for Impact Aid by local school districts, to be invalid as inconsistent with the legislative history of the Impact Aid statute. The district court granted summary judgment to cross-appellants and ordered the Secretary to process the applications using another method of evaluation. We reverse and remand.
 
 Issues
 
 2
 (1) Whether the district court erred in holding that the $50 Rule was inconsistent with the legislative history of the Impact Aid statute;
 
 
 3
 (2) Whether the district court erred in holding that the notice and comment provisions of the Administrative Procedure Act and the General Education Provisions Act do not apply to the $50 Rule;
 
 
 4
 (3) Whether the $50 Rule was applied to the amended applications by the Department of Education in violation of 20 U.S.C. Sec. 1232(c); and
 
 
 5
 (4) Whether the district court erred in holding that the Government is not estopped from applying the $50 Rule to the amended applications.
 
 I. Background
 
 6
 A. The Impact Aid Program.
 
 
 7
 The Impact Aid program grew out of the unprecedented mobilization and war production programs necessitated by World War II. This massive federal activity often caused hardship to local school districts in the area of the activity because large amounts of real property were removed from the tax rolls at the same time the population increased dramatically. When the problem did not subside after the war ended, Congress responded in 1950 by creating the Impact Aid program.[1] It was a continuation of certain previously existing programs, and its stated purpose was to provide "Federal assistance to those areas which are or may become overburdened by reason of increased Federal activities."[2] Congress attempted to achieve this purpose by providing funds which the local educational agencies (LEA) could use to pay for their current operating expenses.
 
 
 8
 Three types of assistance are available under the Impact Aid program. Section 3 Assistance[3] is intended to
 
 
 9
 compensate school districts in reasonable amounts for the cost of educating children who, because they reside on tax-exempt Federal property or because their parents are employed on such property, do not in effect pay their own way. * * *
 
 
 10
 The statute prescribes the rate of payment, called the local contribution rate (LCR), and gives the Secretary of Education (Secretary) the task of determining which school districts are "generally comparable" to the applicant LEA's district. It also establishes a minimum payment amounting to one-half the average per-pupil expenditure in the applicant's state, or one-half the average per-pupil expenditure in the United States as a whole, whichever is greater.[4]
 
 
 11
 The regulations provide two methods for determining "generally comparable" school districts: the group rate method and the individually selected comparable district (ISCD) method.[5] Since 1977, California has used the ISCD method exclusively. Under the ISCD method, the applicant LEA submits the names of "approximately five" school districts in its state that it considers generally comparable to its own district. The Secretary then reviews the application and selects those districts he considers generally comparable to the applicant's district. The regulations set out the factors the Secretary is required to consider in determining general comparability. Once the generally comparable districts are selected, the amount spent on current expenditures from local sources by these districts is determined. That amount is divided by the total average daily attendance of students in the generally comparable districts. The quotient is the LCR to which the applicant school district is entitled.
 
 
 12
 B. The $50 Rule.
 
 
 13
 For almost 30 years the Secretary has used an unwritten guideline, the $50 Rule, to aid in evaluating claims of general comparability. The $50 Rule compares the "local effort" of the applicant district to the proposed LCR obtained from the districts to which it claims to be generally comparable. "Local effort" is determined by dividing the total revenues for current expenditures obtained solely from local sources by the number of "non-federal" children.[6] A proposed LCR generally will not be approved if it exceeds an LEA's local effort by more than $50. Thus, the $50 Rule seeks to ensure that Impact Aid payments are related to the amount the LEA actually spends to educate its children without regard to the federal impact.
 
 
 14
 C. The Grid.
 
 
 15
 In fiscal years (FY) 1978 and 1979, the Secretary also used a "grid" to evaluate an applicant's claim of generally comparable school districts. The "grid" is simply a list of 14 criteria used to compare school districts. The criteria are legal classification, total average daily attendance, cost per pupil paid from local sources and from all sources, grade levels maintained, percent of pupils transported, pupil-teacher ratio, assessed valuation per pupil, ratio of assessed value to true value, tax rate for current expenses and for all school purposes, curricula offered, teacher salary, and economic characteristics. Using the grid, the Secretary determined that school districts were generally comparable to the applicant only when they were comparable in at least 5 of the 14 criteria.
 
 
 16
 The grid was used in conjunction with the $50 Rule in FY 1978. In FY 1979, for a period of only about 3 months, the grid was used exclusively before it was dropped completely.
 
 
 17
 D. The Facts.
 
 
 18
 Initially, the Secretary informed all applicants that the $50 Rule would be used to calculate the LCR's for FY 1979. The LEA's involved in this appeal spent a relatively small amount per pupil in the second fiscal year that preceded 1979.[7] Therefore, they submitted initial applications requesting the statutory minimum LCR of $792.09, or one-half the average per-pupil expenditure in California. In these initial applications, the LEA's were not required to submit the names of generally comparable school districts since they had requested the minimum LCR.
 
 
 19
 On April 9, 1979, a memorandum was circulated within the Department of Education (department) concerning the treatment of ISCD applications for FY 1979. The memorandum stated that the grid method was to be used to evaluate general comparability, with a minimum of 5 of the 14 criteria necessary to establish comparability. In doing so, it changed long-standing department policy by dropping the $50 Rule. Pursuant to this memorandum, the department processed approximately 700 original ISCD applications. Of these, 129 LEA's received LCR's higher than they could have obtained under the $50 Rule.
 
 
 20
 The LEA's involved in this case filed amended applications following the change in department practice. These amended applications requested substantially higher LCR's than had the original applications. Eight of the applications were initially approved by the department.[8] The department later rescinded its approval and refused to approve any of the other amended applications the LEA's had filed.
 
 
 21
 The LEA's filed requests for an administrative hearing to challenge the department's refusal to approve the amended applications. The administrative law judge (ALJ) held that the predecessor to 34 C.F.R. Sec. 222.30(b)(2) expressly authorized the Secretary "to make the type of comparison that takes place under the '$50 Rule' in deciding whether to approve an LEA's local contribution rate." The ALJ also found that the $50 Rule was an interpretative rule and therefore not subject to the notice and comment requirements of the Administrative Procedure Act (APA) or the General Education Provisions Act (GEPA). Lastly, the ALJ determined that only four of the LEA's had relied to their detriment on the department's initial approval of their amended applications. The ALJ ordered the department to reinstate its approval of those four applications.
 
 
 22
 Some of the LEA's requested review of the ALJ's decision by the Secretary. The Secretary declined to review the decision, finding nothing in the record to indicate clear abuse of discretion by the ALJ.
 
 
 23
 Two suits were filed in the United States District Court for the Southern District of California by the school districts, and the two were later consolidated.[9] The district court rendered an oral opinion on cross-motions for summary judgment. First, the district court held that the $50 Rule was an interpretative rule and that it was not invalid for failure to follow the notice and comment procedures of the APA or the GEPA. The court also held that the LEA's were not entitled to the additional aid under a theory of equitable estoppel. The district court held the $50 Rule invalid, however, concluding that it was inconsistent with the legislative history of the Impact Aid law. The district court considered the $50 Rule to be limited to comparison of one factor, local effort, to the exclusion of all others, and to operate as a cap on the amount of aid that could be obtained by an LEA. The district court ordered the Secretary to process the LEA's applications using the grid method but stayed compliance with its order pending appeal.
 
 
 24
 The Secretary appealed the judgment to the United States Court of Appeals for the Ninth Circuit, which reversed the district court on the issue of the validity of the $50 Rule.[10] The LEA's then petitioned the United States Supreme Court for certiorari, which petition was granted. The Court summarily disposed of the case by vacating the judgment of the Ninth Circuit and remanding the case for transfer to this court pursuant to 28 U.S.C. Sec. 1631.[11]
 
 II. Jurisdiction
 
 25
 The Tucker Act, 28 U.S.C. Sec. 1491 (1982), vests exclusive jurisdiction in the Claims Court of any action against the United States "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department" which exceeds the amount of $10,000. The district courts have concurrent jurisdiction with the Claims Court of such actions when they do not exceed $10,000.[12]
 
 
 26
 It is well settled that where the prime effort of the plaintiff is to obtain money from the Government, the exclusive jurisdiction of the Claims Court cannot be avoided by drafting a complaint which appears to seek only injunctive, mandatory, or declaratory relief against the Government.[13] Here, it is clear that the prime effort of the LEA's is to obtain money from the Government. The Chula Vista plaintiffs sought a declaration that "the class members [are] entitled to the local contribution rates requested in their highest revised Applications * * * for Fiscal Year 1979," and requested an injunction "ordering and directing Defendant to process and pay to the class members Federal Impact Aid * * * based on their highest revised Applications." The Poway and Sweetwater plaintiffs requested similar relief, including a declaration that "plaintiffs are entitled to the local contribution rate requested in their revised applications * * * for fiscal year 1979," and an order "compel[ling] defendant to perform a duty owed to plaintiffs to approve their revised applications."
 
 
 27
 The plaintiff districts of Poway and Sweetwater sought an additional $462,000 and $167,000 respectively in their amended applications. Both of these claims exceed the $10,000 limit on the district court's jurisdiction and must be dismissed.
 
 
 28
 As a class, the Chula Vista plaintiffs seek over $12 million. However, aggregation of claims by individual plaintiffs for jurisdictional purposes is permitted only when there is a "single title or right in which they have a common and undivided interest."[14] Similar rules apply to class actions. Where the members of the class are not suing with respect to a common interest, there will be no aggregation of claims.[15] The claim of each member of the class must be examined separately to determine whether it meets the jurisdictional requirement. Of the 55 members of the class, only 6 present claims which do not exceed the $10,000 limit.[16] Therefore, only those six claims were properly before the district court. The 49 remaining claims are remanded to the district court to be dismissed for lack of jurisdiction.
 
 III. Validity of the $50 Rule
 
 29
 A. Standard of Review.
 
 
 30
 In reviewing a grant of summary judgment, the appellate court must determine whether the strict standard set out in Fed.R.Civ.P. 56(c) has been met.[17] Where, as here, the only issue before the district court is one of statutory interpretation, a question of law, the appellate court independently determines the proper interpretation and need not defer to the district court.
 
 
 31
 This court will give substantial weight to the interpretation given a statute by the agency charged with its administration.[18] This deference is particularly appropriate when "the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." '[19] The agency's construction of a statute should be followed unless there are compelling indications that it is wrong.[20] The agency's interpretation need not be the only reasonable construction, or the one the court would have adopted had the question arisen initially in a judicial proceeding; it just has to be a reasonable interpretation.[21] "As a general rule, a long-standing interpretation of a statute by an agency charged with its administration must be upheld if reasonable."[22]
 
 
 32
 B. Consistency of the $50 Rule with the Impact Aid Statute.
 
 
 33
 It is undisputed that the $50 Rule does not conflict with the express language of the Impact Aid statute because the statute does not define the term "generally comparable." The district court invalidated the $50 Rule believing it to be inconsistent with the legislative history of the act. The court held that it operated as a cap on the amount of aid that could be obtained, and that it limited comparison to a single factor, which the House report explicitly discouraged.
 
 
 34
 The House committee report referred to by the court discussed the concept of comparable communities.[23]
 
 
 35
 The determination as to the amount of payment to be made with respect to each child depends in part, as has been said, upon a determination by the Commissioner of Education as to which school districts within the State are most nearly comparable to the school district of the educational agency to be compensated. In the last analysis, a school district's current expenditures are determined by the amount of money it has available. In a school district providing education to large numbers of children connected with Federal property, the current expenditures will be affected by the fact that the Federal Government is not contributing its proper share of local school revenues. Hence, in arriving at a sum which approximates the cost of providing education to the Federal children in question, it would not be reasonable to consider merely current expenditures met from local revenues of the district in question.
 
 
 36
 Among other things the Commissioner would first consider similarity of classification under State law, and then other relevant factors, such as number and kind of school population, tax resources, tax effort, costs of school maintenance and operation, and the like.
 
 
 37
 In some States the laws governing the classification of school districts would have considered such factors sufficiently so that it will be unnecessary to go any further in determining comparability. In other States, however, this will not be the case. In such States, resort will have to be had to the various factors relevant to the determination of comparability. The greater the number of school districts that can be considered in the light of these factors, the more objective and equitable the determination will be. It would not affect the result, of course, insofar as the school district's eligibility for the payment, or the amount thereof, is concerned, that in actual fact its current expenditures per child from local sources (including the payments under this section) turn out to be greater or less than the payment per Federal child.
 
 
 38
 In invalidating the $50 Rule, the district court stated that
 
 
 39
 if Congress had intended to limit an applicant's local contribution rate to an amount that was close to/or within some kind of a tolerance of expenditures, of local revenues of that district, I think it would have been very simple to do so. Congress could have specifically said there shall be a limit, there shall be a cap. Now, the statute requires a comparison of districts more than a single criterion or rule [sic ], and the fifty dollar rule which appears to me in its effect an application [sic ] here as a cap, to limit comparison to a single factor, I don't think is consistent with the statute * * *.
 
 
 40
 The district court believed that the $50 Rule limited comparison to just one factor. However, it is clear that local effort includes several of the factors which Congress stated should be considered. Among the other factors listed are tax resources, tax effort, and the number and kind of school population. Local effort is calculated by dividing the total revenues for current expenditures from local sources by the number of non-federal children in average daily attendance. Total revenues for current expenditures from local sources is calculated by multiplying the assessed valuation, or tax resources, by the tax rate for current expenses, or tax effort.
 
 
 41
 The district court apparently believed that no single criterion could be so important that failure to meet it would preclude a finding of comparability. However, even if local contribution is viewed as a single factor, nothing in the legislative history requires such a conclusion. The fact that Congress set out certain factors for consideration does not prohibit the Secretary from concluding that some are more important than others. It was not beyond the Secretary's authority to determine that one factor, local contribution, was so critical that, unless it was met, there could be no finding of comparability.
 
 
 42
 In addition, the district court seems to have focused on the statement in the report that "it would not be reasonable to consider merely current expenditures met from local revenues of the district in question" in concluding that the $50 Rule was invalid.
 
 
 43
 However in 1979, the real and final actual determinations appear to have been made pursuant to the fifty dollar rule, and I think under the presentation that's [sic ] been made here and the various documents and arguments, it is quite apparent that the other factors, that is, the grid factors, really were not given any substantial consideration. They were perhaps considered up to a certain point, but then the fifty dollar rule was applied to deny the applications; and in my view, the defendants, that is the Deparment's [sic ] interpretation of the act, was beyond its authority. It seems to me that the exclusive comparison between an applicant district and the group of selected districts under the fifty dollar rule is made of current expenditures from local sources almost exclusively, and if one looks at the House committee report, which considered this problem, I think one would have to agree that the exclusive use of that factor was explicitly discouraged by the House Committee report * * *.
 
 
 44
 The language cited by the district court does not prohibit the comparison made by the $50 Rule. The statement in the report is ambiguous at best. It might mean that a direct comparison of current expenditures from local revenues between districts is never permissible. On the other hand, it might mean that such a comparison is permitted, but is only one factor to consider in determining if districts are generally comparable. Because the legislative history does not foreclose the department's interpretation of the statute, we only inquire as to the reasonableness of that interpretation.
 
 
 45
 The purpose of the Impact Aid program is to "compensate school districts in reasonable amounts for the cost of educating children who, because they reside on tax-exempt Federal property or because their parents are employed on such property, do not in effect pay their own way."[24] The House report expressly authorized consideration of such factors as tax resources and tax effort. The recognition of the importance of financial considerations to the determination of comparability supports the $50 Rule. In addition, the $50 Rule eliminates the distortion of local revenues caused by the federal presence by dividing current expenditures from local revenues by the number of non-federal children only. Thus, the $50 Rule measures the willingness of the LEA to tax itself in order to educate its children. It also furthers the purpose of the act by focusing on the actual amount spent by the LEA per non-federal child.
 
 
 46
 Because the $50 Rule is not inconsistent with the legislative history of the Impact Aid statute and, furthermore, it being a reasonable interpretation of the statute, we hold the $50 Rule to be valid.
 
 IV. Notice and Comment Procedures
 
 47
 The LEA's contend that the district court erred in holding that the $50 Rule was not subject to the notice and comment procedures of the APA. The district court held that because the rule involved a grant or benefit, it was not required to comply with the notice provisions of the APA. There was no error in this conclusion. The APA specifically exempts grants and benefits from those provisions.[25]
 
 
 48
 The district court also found that the $50 Rule was an interpretative rule, not a substantive one, and thus was not subject to notice and comment procedures. An interpretative rule describes the agency's view of the meaning of a statute. A substantive rule grants rights or imposes obligations on those affected by it.[26] It is clear that the $50 Rule is an interpretative rule, as the district court found. For this additional reason, it is not subject to the notice requirements of the APA.[27]
 
 
 49
 The LEA's argue that the district court also erred in holding that similar provisions in the GEPA did not apply. The GEPA provides that regulations are to be published and are subject to the APA's notice and comment procedures. The act makes clear that the term regulation is to be broadly construed.[28] However, rules already in effect when the act was passed were not intended by Congress to be subject to its notice requirement. The House report on the GEPA stated that "all agencies and organizations which are recipients of federal education funds must be apprised of any proposed additions or changes which affect their programs and must be afforded an opportunity to comment upon them."[29] (Emphasis supplied.)
 
 V. Uniform Application of the Rule
 
 50
 The LEA's argue that 20 U.S.C. Sec. 1232(c) (1982), which states that "[a]ll such regulations shall be uniformly applied and enforced throughout the fifty States," requires the Secretary to approve their amended applications using the grid alone to determine comparability.
 
 
 51
 The LEA's contend that the use of the grid for the applications of districts in all the other states and the reinstatement of the $50 Rule only with respect to the class members, all of whom are located in California, violated 20 U.S.C. Sec. 1232(c). However, the LEA's did not prove that there was any geographic nonuniformity resulting from the use of the grid and the $50 Rule. First of all, only 20 states use the ISCD method, and the grid was used only in those states. In addition, at least 5 of the 129 LEA's whose applications were approved using the grid were from California.[30] The LEA's have not shown that California districts as a group were treated differently from the districts in the other states using the ISCD method. Therefore, they have not shown that the use of the $50 Rule violated 20 U.S.C. Sec. 1232(c).
 
 
 52
 The $50 Rule was not applied to the LEA's applications in such a way as to violate 20 U.S.C. Sec. 1232(c). The Secretary had a 30-year policy of applying the $50 Rule to evaluate Impact Aid applications. For a short time--merely 3 months--a new method, the grid, was tried, but it was dropped when it became clear that it was not a good evaluation tool. At that point, the Secretary reverted to his old method, the $50 Rule. The Secretary's approval of applications using the grid during the experimental period and subsequent disapproval of some applications using the $50 Rule does not violate 20 U.S.C. Sec. 1232(c).
 
 
 53
 Ordering the Secretary to use the grid to evaluate the LEA's applications would reduce the likelihood of innovation in the department in the future. If the Secretary feared that the department would be forced to continue to use new methods after it was determined that they were ineffective, he would be much less inclined to experiment with new ideas.
 
 VI. Estoppel
 
 54
 Finally, the LEA's argue that the Government is estopped from applying the $50 Rule to their applications. However, the Supreme Court has never held that estoppel may be applied against the Government,[31] although that doctrine has been applied, within its traditional requirements, by lower courts.[32] Assuming that estoppel may be appropriately asserted in this case, "it is well settled that the Government may not be estopped on the same terms as any other litigant. * * * [T]he private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present."[33] Among the elements that the LEA's must prove are that they relied on the conduct of the Government and that they changed their position to their detriment in reliance on that conduct.
 
 
 55
 The school districts have failed to make such a showing here. They have not alleged that they incurred any obligations in reliance upon the Government's approval of their amended applications. It is not enough to assert that they filed amended applications in reliance on the Government's action; they must also show that this left them in a worse position than they would have been otherwise. This they have not done.
 
 Conclusion
 
 56
 The district court had jurisdiction over the complaints of only six of the class plaintiffs, and the remaining actions should be dismissed by the district court for lack of jurisdiction. We agree with the district court that the Government is not estopped from enforcing the $50 Rule against the LEA's. We also agree that the $50 Rule is not subject to the notice and comment procedures of the APA or the GEPA. However, the $50 Rule is not inconsistent with the legislative history of the Impact Aid statute, and it is a reasonable interpretation of that statute. Therefore, the $50 Rule is a valid rule. Furthermore, the use of the rule to evaluate the LEA's applications does not violate the uniformity provision of 20 U.S.C. Sec. 1232(c). The judgment of the United States District Court for the Southern District of California is reversed, and the case is remanded to the district court with instructions to dismiss the complaint of the 49 claimants who seek more than $10,000.
 
 
 57
 REVERSED AND REMANDED.
 
 
 58
 DAVIS, Circuit Judge, concurring in part and dissenting in part.
 
 
 59
 I join all of the court's opinion except for the portion upholding the validity of the $50 Rule. On that issue my position is that (a) the Rule contravenes the governing statute as properly interpreted in the light of the controlling legislative history, and (b) the Rule has not been consistently followed by the administrative agency.
 
 
 60
 First, I think that the House committee report (H.R.Rep. No. 2287, 81st Cong., 2d Sess. 14)--quoted in the majority opinion--makes it absolutely clear that the administrators could not adopt an overriding rule basing comparability primarily or generally on the amount of revenue collected and used by the LEA (aside from federal funds). The committee report said expressly that "it would not be reasonable to consider merely current expenditures met from local revenues of the district in question," but that various relevant factors should be considered. As the District Court explained, the $50 Rule operates in the forbidden manner as the overall governing criterion.
 
 
 61
 Second, the $50 Rule has not been uniformly and consistently applied--the normal standard for deferring to an administrative interpretation. This record shows that the Rule was jettisoned at least in the Spring of 1979 and that some of the appellees had their applications granted in sums that would not have been awarded under the $50 Rule.[1] Thereafter the Department of Education returned to the $50 Rule.
 
 
 62
 I subscribe to the position "that the interrelationship of [the legislative] history with the statutory text follows a continuous spectrum measuring the strength of the language, on the one hand, and the strength of the history, on the other. The more compelling and definitive the words are, the less controlling the legislative history; conversely, the less compelling and definite the language, the more controlling the history to the extent of its strength." Texas State Comm'n for the Blind v. United States, 796 F.2d 400, 415 (Fed.Cir.1986) (separate opinion of Davis, J.). The statutory language at issue is general and indefinite and the administrative practice is inconsistent, while the legislative history is very strong and precise.
 
 
 
 [1]
 Educational Agencies Financial Aid Act, Pub.L. No. 81-874, 64 Stat. 1100 (1950) (codified as amended at 20 U.S.C. Secs. 236-244 (1982))
 
 
 [2]
 1950 U.S.CODE CONG. SERVICE 4014, 4015
 
 
 [3]
 H.R.REP. NO. 2287, 81st Cong., 2d Sess. 11 (1950)
 
 
 [4]
 20 U.S.C. Sec. 238(d)(3) (1982)
 
 
 [5]
 34 C.F.R. Sec. 222.30 (1985). Prior to November 21, 1980, this section was located at 45 C.F.R. pt. 115
 
 
 [6]
 Total revenue for current expenditures from local sources is calculated by multiplying the assessed valuation of the real property by the tax rate for current expenses. A "federal" child is one who either resides on federal property, whose parent is employed on federal property in the county or state in which the district is located, or whose parent is on active duty in the uniformed services. See 20 U.S.C. Sec. 238(b). A "non-federal" child is one who does not meet any of these criteria
 
 
 [7]
 The second preceding fiscal year is the year used for comparison. 34 C.F.R. Sec. 222.30(b) (1985)
 
 
 [8]
 One of those approved was the first of Chula Vista's two amended applications
 
 
 [9]
 The two actions were Chula Vista City School Dist. v. Bell, No. 81-1065-S(H) (S.D.Cal.1982), and Poway Unified School Dist. v. Bell, No. 81-1182-S(M) (S.D.Cal.1982). Chula Vista was a certified class action involving the 54 LEA's to whom the ALJ granted no relief plus Chula Vista to whom he granted only partial relief. Poway was an action brought by two LEA's, Poway and Sweetwater, to whom the ALJ granted no relief. The plaintiffs in Poway were also plaintiffs in Chula Vista
 
 
 [10]
 Chula Vista City School Dist. v. Bell, 762 F.2d 762 (9th Cir.1985)
 
 
 [11]
 Chula Vista City School Dist. v. Bennett, --- U.S. ----, 106 S.Ct. 876, 88 L.Ed.2d 913 (1986)
 
 
 [12]
 28 U.S.C. Sec. 1346(a)(2) (1982)
 
 
 [13]
 Hoopa Valley Tribe v. United States, 596 F.2d 435 (Ct.Cl.1979); see Maier v. Orr, 754 F.2d 973 (Fed.Cir.1985)
 
 
 [14]
 Snyder v. Harris, 394 U.S. 332, 335, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319 (1969); see Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973)
 
 
 [15]
 March v. United States, 506 F.2d 1306 (D.C.Cir.1974)
 
 
 [16]
 The six are: Brentwood Union Elementary School District, $8,007.13; Byron Union Elementary School District, $3,589.05; Oakley Union Elementary School District, $6,825.40; Rescue Union Elementary School District, $9,528.41; St. Helena Unified School District, $3,309.34; Soledad Union Elementary School District, $8,497.41
 
 
 [17]
 Lemelson v. TRW, Inc., 760 F.2d 1254 (Fed.Cir.1985)
 
 
 [18]
 Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); American Lamb Co. v. United States, 785 F.2d 994 (Fed.Cir.1986)
 
 
 [19]
 Tallman, 380 U.S. at 16, 85 S.Ct. at 801 (quoting Power Reactor Co. v. International Union of Elec., Radio, & Mach. Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961))
 
 
 [20]
 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Wilson v. Turnage, 791 F.2d 151 (Fed.Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986)
 
 
 [21]
 Tallman, 380 U.S. at 16, 85 S.Ct. at 801; Kester v. Horner, 778 F.2d 1565 (Fed.Cir.1985), cert. denied, --- U.S. ----, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986)
 
 
 [22]
 Horner v. Andrzjewski, 811 F.2d 571, 574 (Fed.Cir.1987)
 
 
 [23]
 H.R.REP. NO. 2287, 81st Cong., 2d Sess. 14 (1950)
 
 
 [24]
 H.R.REP. NO. 2287, 81st Cong., 2d Sess. 11 (1950)
 
 
 [25]
 5 U.S.C. Sec. 553(a)(2) (1982); National Wildlife Fed'n v. Snow, 561 F.2d 227 (D.C.Cir.1976)
 
 
 [26]
 Batterton v. Marshall, 648 F.2d 694 (D.C.Cir.1980)
 
 
 [27]
 5 U.S.C. Sec. 553(d)(2) (1982); see Conservative Caucus, Inc. v. United States, 650 F.2d 1206, 1211, 28 Ct.Cl. 45 (1981)
 
 
 [28]
 20 U.S.C. Sec. 1232(a)(1) (1982) provides: "For the purpose of this section, the term 'regulation' means any rules, regulations, guidelines, interpretations, orders, or requirements of general applicability prescribed by the Secretary."
 
 
 [29]
 H.R.REP. NO. 805, 93d Cong., 2d Sess., reprinted in 1974 U.S.CODE CONG. & ADMIN.NEWS 4093, 4154
 
 
 [30]
 These five LEA's are members of the class in this case. They are Byron Union Elementary School District, Grossmont Union High School District, San Ramon Valley Unified School District, Surprise Valley Joint Unified School District, and Susanville Elementary School District. It is instructive to consider the applications filed by these districts. In their original applications, the amount by which their requests exceeded their local effort ranged from $53 to $138; in their amended applications, this difference ranged from $496 to $1,150
 
 
 [31]
 Heckler v. Community Health Servs., 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)
 
 
 [32]
 American Elec. Laboratories v. United States, 774 F.2d 1110 (Fed.Cir.1985); Merchants Nat'l Bank of Mobile v. United States, 689 F.2d 181, 231 Ct.Cl. 563 (1982); Broad Ave. Laundry & Tailoring v. United States, 681 F.2d 746, 231 Ct.Cl. 1 (1982)
 
 
 [33]
 Community Health Servs., 467 U.S. at 60-61, 104 S.Ct. at 2224
 
 
 [1]
 The court's opinion points out that 129 LEAs received awards higher than they could have obtained under the $50 Rule